

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-07-00089-CV
_____

OMAHA HEALTHCARE CENTER, L.L.C., Appellant

V.

WILMA JOHNSON, ON BEHALF OF THE
ESTATE OF CLASSIE MAE REED, DECEASED, Appellee

On Appeal from the 276th Judicial District Court
Morris County, Texas
Trial Court No. 23,220

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

Omaha Healthcare Center, L.L.C., appeals the trial court's order denying its motion to dismiss for the failure of Wilma Johnson, on behalf of the Estate of Classie Mae Reed, to serve an expert report in a health care liability claim (HCLC).[1] We affirm the order denying the motion to dismiss.

**A.     Pleadings**

According to Johnson's petition, Reed was, at all relevant times, under the care of Omaha as a resident of a nursing home operated by Omaha. On February 12, 2005, Reed was taken to a hospital emergency room for pain and discoloration of her leg. According to the petition, "It was later determined that the cause of the pain and discoloring was a spider bite, specifically a brown recluse." Reed died May 5, 2005, "as a result of the spider bite she sustained while in the care of" Omaha.

On September 22, 2006, Johnson filed this negligence (wrongful death, survivor) action, asserting:  that Reed was Omaha's invitee on the premises; that the premises posed an unreasonable risk of harm; that Omaha had a duty of ordinary care to maintain the premises in a safe condition; that Omaha breached that duty by failing to inspect for spider infestation; that Omaha breached that

---

[1]*See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (Vernon Supp. 2007) (interlocutory appeal), § 74.001(a)(13) (Vernon 2005) (defining HCLC).  Section 74.351 addresses dismissal of HCLCs for failure to file an expert report, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon Supp. 2007), though the current version applies only to a cause of action accruing after September 1, 2005.  Although our analysis is not affected by the 2005 amendment, we apply the former version of Section 74.351 in this case since the cause of action accrued before the effective date.  *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875, *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, §§ 1–3, 2005 Tex. Gen. Laws 1590, 1590.

2

duty by failing to clean to prevent spider infestation; that Omaha breached that duty by failing to institute pest control procedures and policies to prevent spider infestation; and that Omaha breached that duty by failing to prevent spider infestation. Johnson did not base her claim on any alleged negligence once the spider had bitten, i.e., in treatment, diagnosis, or delay in treatment or diagnosis.

In March 2007, more than 120 days after the claim was filed, Omaha filed its motion to dismiss for failure to file an expert report in an HCLC. Omaha contended that the claim was a safety HCLC requiring service of an HCLC expert report. The trial court denied Omaha's motion to dismiss.

Omaha appeals, raising one point of error: whether it was error to refuse to dismiss the suit for failure of the claimant to serve an expert report. This requires the answering of the question of whether this is an HCLC, which question, in turn, requires construction of the statutory definition.

**B.      Expert Report Requirement**

In an HCLC, a claimant shall, not later than the 120th day after filing the claim, serve an expert report with the expert's curriculum vitae upon each physician or provider against whom liability is asserted. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875, *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, §§ 1–3, 2005 Tex. Gen. Laws 1590, 1590. Should a claimant fail to file the required report, and on proper motion by the defendant, the statute requires that the trial court shall award costs and fees to that defendant and

3

dismiss the claim with respect to that defendant.  *Id.*  The dismissal is mandatory.  *See Thoyakulathu v. Brennan*, 192 S.W.3d 849, 853 (Tex. App.—Texarkana 2006, no pet.).

Johnson concedes that she did not serve an expert report under the former Section 74.351. Johnson contends instead that, because her action is not an HCLC, she is not required to serve the expert report.  *See Parker v. CCS/Meadow Pines, Inc.*, 166 S.W.3d 509, 512 (Tex. App.—Texarkana 2005, no pet.) ("Section 74.351(a) applies only to healthcare liability claims.").  The question, then, is whether Johnson's claim constitutes an HCLC.

## C.      Standard of Review

"Whether a cause of action advances a healthcare liability claim is a question of law to be reviewed de novo . . . ."  *Id.*; *see also Lee v. Boothe*, 235 S.W.3d 448, 451 (Tex. App.—Dallas 2007, pet. filed); *Boothe v. Dixon*, 180 S.W.3d 915, 919 (Tex. App.—Dallas 2005, no pet.); *cf. Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 543–44 (Tex. 2004) (under predecessor statute, essentially conducting de novo review, though not stating standard).  *But see Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001) (in case assessing *adequacy* of a filed report, holding that abuse of discretion standard applies to expert report review).

4

**D.      HCLC:  Safety Directly Related to Health Care?**

An HCLC is defined by the statute as

> a cause of action against a health care provider[2] . . . for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(13) (Vernon 2005).  Omaha contends only that Johnson's claim is a safety claim.[3]  Johnson contends that it is not a safety claim directly related to health care.

The phrase "directly related to health care" was added to the definition of an HCLC in 2003. Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 865.  In addition to adding that phrase, the Legislature also added the disjunctive phrase "professional or administrative services" in the same clause. *Id.*  The question is whether "directly related to health care" modifies and restricts both "safety" and "professional or administrative services" or only the latter.

---

[2]A "health care provider" includes, under Chapter 74, a "health care institution," which includes a nursing home. TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(12)(A)(vii), (11)(J) (Vernon 2005).

[3]Omaha has never attempted to characterize Johnson's claim under any other part of the statute, e.g., a health care or professional or administrative services claim.

There is no controlling authority interpreting whether a safety claim must now be directly related to health care,[4] although two courts of appeals have concluded that it must.[5]  *See Christus Health v. Beal*, 240 S.W.3d 282 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Valley Baptist Med. Ctr. v. Stradley*, 210 S.W.3d 770, 775 (Tex. App.—Corpus Christi 2006, pet. denied).  For the reasons that follow, we agree with our sister courts that have analyzed the question.

When interpreting statutes, "we try to give effect to legislative intent."  *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex. 1999).  To do so, we look first to the

---

[4]In 2005, the Texas Supreme Court interpreted a safety claim under the repealed statute.  *See Diversicare Gen'l Partner, Inc. v. Rubio*, 185 S.W.3d 842 (Tex. 2005).  While the lead opinion does not construe the amended statute, both the concurring and dissenting opinions do, coming to different conclusions.  *See id.* (Jefferson, C.J., concurring, and O'Neill, J., dissenting).

The repealed statute (the Medical Liability and Insurance Improvement Act (MLIIA)), at Article 4590i of the Texas Civil Statutes defined a "health care liability claim" as

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract.

Act of April 19, 1977, 65th Leg., R.S., ch. 817, § 1.03(a), 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

[5]At least one other case has applied *Diversicare* to a safety claim accruing after the effective date of the amended statute without acknowledging the changed statutory language and without analyzing whether a safety claim must be "directly related to health care."  *See Devereaux v. Harris Co. Hosp. Dist.*, No. 01-05-00706-CV, 2007 WL 852618, at *3–5 (Tex. App.—Houston [1st Dist.] Mar. 22, 2007, no pet.) (mem. op.); *see also In re Kiberu*, 237 S.W.3d 445 (Tex. App.—Fort Worth 2007, orig. proceeding [mand. filed.]) (following *Diversicare*, without analyzing amended language, in finding that sexual assault by hospital radiology technician, while conducting CT scan, was an HCLC for purpose of considering Rule 202 order).

6

plain, simple, and unambiguous language of the statute. *City of San Antonio v. Tex. Attorney Gen.*, 851 S.W.2d 946, 951 (Tex. App.—Austin 1993, writ denied); *cf. Fitzgerald*, 996 S.W.2d at 865–66. In starting our analysis with the Legislature's words, "[w]e may consider textual aids to construction for the insight they may shed on how the Legislature intended that their words be interpreted. In doing so, we look at the entire act, and not a single section in isolation." *Fitzgerald*, 996 S.W.2d at 866 (footnotes omitted). We approach the statutory text according to the rule that "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 2005).

The first rule of grammar that guides our construction is: "Modifiers should come, if possible, next to the words they modify." William Strunk, Jr. & E. B. White, THE ELEMENTS OF STYLE R. 20 (4th ed. 2000); *see also* Bryan A. Garner, GARNER'S MODERN AMERICAN USAGE 523–24 (2003) (hereafter "GARNER'S") (the "true referent should generally be the closest appropriate word"). This is similar to the last antecedent doctrine of statutory interpretation, which states that "where no contrary intention appears, relative and qualifying words, phrases, and clauses are to be applied to the immediately preceding words or phrase. Such words, phrases, and clauses are not to be construed as extending to or modifying others which are more remote . . . ." 82 C.J.S. STATUTES § 333 (1999) (footnotes omitted).

But, this rule is not inflexible. "Proximity isn't the only signal of what referent a word is pointing to . . . ." GARNER'S at 523–24 (denoting number, gender, case, and syntactic strength of the

7

referent as considerations).  The last antecedent doctrine of statutory interpretation similarly looks to syntactic strength; it notes that where "several words are followed by a clause which is as much applicable to the first and other words as to the last, the clause should be read as applicable to all." 82 C.J.S. STATUTES § 333 (footnote omitted).

The modifying phrase "directly related to health care" follows several possible referents, all disjunctive but not all separated by commas.  We are further guided in interpreting which of these words and phrases are the true referents by another rule of grammar:  "When a conjunction joins the last two elements in a series, a comma is used before the conjunction."  THE CHICAGO MANUAL OF STYLE R. 5.57 (14th ed. 1993).  *But see* GARNER'S at 654 (noting that some grammarians disagree that the penultimate entry in a series should be followed by a comma).  Garner denotes a particular circumstance in which the serial (final) comma is required:  "When the members [of a series] are compound, calling for *and* within themselves, clarity demands the final comma."  GARNER'S at 654. Indeed, when list elements themselves contain two or more items, the "last two elements are muddled if the comma is omitted."  *Id.* at 303–04; *see also* David W. Ewing, *Writing for Results in Business, Government, and the Professions* 358 (1974), quoted in GARNER'S at 654 (omission of the serial comma allows the final entries to be "joined" or "read as one category"); *cf. Ludwig v. State*, 931 S.W.2d 239, 242 (Tex. Crim. App. 1996) (generally, "a comma should precede a conjunction connecting two coordinate clauses or phrases in a statute in order to prevent the following qualifying phrases from modifying the clause preceding the conjunction").

8

The statute does use commas to separate the first two categories ("medical care, or health care,") from the rest, but uses no other commas before the modifying phrase. The serial comma rule and last antecedent doctrine suggest a reading of "safety or professional or administrative services" as the compound final category. *Accord Stradley*, 210 S.W.3d at 775 (finding that "safety" and "professional or administrative services" claims fall into the same class of claim because they are not separated by commas).[6]

We find additional support for limiting "safety" by "directly related to health care" from reading the definition of an HCLC in the context of the entire definitions section of the statute. The phrase "directly related to health care" incorporates the statutorily defined term "health care."[7] "Health care," in turn, relates to acts or treatment for, to, or on behalf of *a* patient. TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(10) (emphasis added). In the definition of an HCLC, which otherwise includes terms included in the definition of health care, only "safety" and "professional or

---

[6]In his concurring opinion, Chief Justice Jefferson rejected modifying "safety" by "directly related to health care" after concluding that doing so would also require modifying "medical care" and "health care"—a result he labeled "redundant." *See Diversicare*, 185 S.W.3d at 861 n.4 (Jefferson, C.J., concurring). We disagree such a result is required. The rules of grammar and the last antecedent doctrine suggest that the modifying phrase is not extended to the more remote entries preceding the comma in which the modifying phrase is located (i.e., "medical care, or health care,") since they are separated syntactically.

[7]"Health care" is defined under the statute as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(10) (Vernon 2005).

9

administrative services" could, if not limited, relate to the patient population generally—and not a particular patient—or to no patient at all.[8]

Finally, we find additional support for this construction by looking at the definition of an HCLC in the context of the entire Act, and not in isolation. The Legislature included specific findings and statements of purpose when it amended and re-codified the previous MLIIA in 2003. Among these are a finding that there is a medical malpractice insurance crisis and a statement of purpose to improve and modify the handling of an HCLC "in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(b)(3), 2003 Tex. Gen. Laws 847, 884; *see also* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(a)(5), 2003 Tex. Gen. Laws 847, 884. The Legislature further stated that the purpose of the Act is to "make certain modifications to the liability laws as they relate to health care liability claims only and with an intention of the legislature to not extend or apply such modifications of liability laws to any other area of the Texas legal system or tort law." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(b)(7), 2003 Tex. Gen. Laws 847, 885. Given this context, we must construe the limiting clause "directly related to health care" in such a way that we do not extend the definition of an HCLC to other areas of tort law or in a manner unduly restrictive of a claimant's rights, except as authorized. *Accord* Michael S. Hull, et al., *House Bill 4 and Proposition 12: An*

---

[8]*Accord* S.J. OF TEX., 78th Leg., R.S. 5004 (2003) (senate sponsor of the 2003 revision bill referenced the statutory definition of health care and explained that "the services must relate directly to the treatment of a particular patient").

*Analysis with Legislative History, Part Three*, 36 TEX. TECH L. REV. 169, 177 (2005) (noting that the definition, through addition of "directly related to," "was narrowed in scope").

Reading the Legislature's words in the context of the section and full statute, in accordance with rules of grammar, we find that the phrase "directly related to health care" correctly and unambiguously modifies each part of the last part of the definition, i.e., both "safety" and "professional or administrative services." *See* TEX. GOV'T CODE ANN. § 311.011 (Vernon 2005); *see also Stradley*, 210 S.W.3d at 775 (holding same, and finding that to construe the statute otherwise "would be an arbitrary and legislatively unauthorized expansion of the health care liability statute"); *and see Beal*, 240 S.W.3d 282 (same). A safety claim must be "directly related to health care" to be actionable as an HCLC.

## E.     Analysis:  Safety Directly Related to Health Care

We turn now to determine whether Johnson's claim is a safety claim directly related to health care. A plaintiff cannot recast an HCLC as another cause of action and so avoid the requirements applicable to HCLCs. *Diversicare*, 185 S.W.3d at 851; *Murphy v. Russell*, 167 S.W.3d 835, 838 (Tex. 2005); *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 544 (Tex. 2004); *Sorokolit v. Rhodes*, 889 S.W.2d 239, 242 (Tex. 1994). In examining an alleged HCLC, "we examine the underlying nature of the claim and are not bound by the form of the pleading." *Diversicare*, 185 S.W.3d at 847; *see also Sorokolit*, 889 S.W.2d at 242; *Parker*, 166 S.W.3d at 512 (not bound by plaintiff's claim characterization). A consideration that may assist in determining if a claim is an HCLC is whether

11

expert testimony from a medical or health care professional is necessary to prove the claim. *See Diversicare*, 185 S.W.3d at 848; *Rose*, 156 S.W.3d at 544.

Omaha contends, relying on *Diversicare*, that essentially all premises liability claims by residents of twenty-four-hour-a-day nursing care facilities are safety claims directly related to health care.[9] In *Diversicare*, the court examined negligence and contract claims against a nursing home for several sexual assaults of one patient by another. The court noted that a "nursing home provides services to its patients, often around the clock." *Diversicare*, 185 S.W.3d at 849. A nursing home's services include "meeting the fundamental care needs of the residents." *Id.* (citing TEX. HEALTH & SAFETY CODE ANN. § 242.001 (Vernon 2001)).[10] The court noted that "[t]hese services are provided by professional staff including physicians, nurses, nurse aides, and orderlies who care for the residents." *Id.* at 849–50. The court, noting that lapses in the restraint of both residents was a factor

---

[9]Similarly, Omaha states that a contract, the "sole purpose of which" is to provide health care, governs its relationship with Reed so that any claim by Reed against Omaha must be an HCLC. We are aware of no contract in the record. To the extent Omaha raises contract as a general argument in support of categorizing any claims against a nursing home an HCLC, we note that Omaha has presented no authority in support. To the extent Omaha relies on particular contractual terms relating pest control to Reed's health care, we note that Omaha has provided no record citation.

For an issue to be properly before this Court, the issue must be supported by argument and authorities and must contain appropriate citations to the record. *See* TEX. R. APP. P. 38.1(h). An inadequately briefed issue may be waived on appeal. *See Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (discussing "longstanding rule" that point may be waived due to inadequate briefing). Accordingly, we will not consider the contract issue. *See id.*

[10]The court listed, among other fundamental needs, "providing sanitary living conditions." *Diversicare*, 185 S.W.3d at 849 (citing 40 TEX. ADMIN. CODE 19.901(1)).

in the claim, determined that the essence of the sexual assault claims involved lapses in professional judgment and treatment of both the claimant and the resident who assaulted her. *Id.* at 851.

The court distinguished a hypothetical sexual assault against a visitor to a nursing home from the fact of a sexual assault of one nursing home resident by another resident, noting that there "is an important distinction in the relationship between premises owners and invitees on one hand and health care facilities and their patients on the other. The latter involves health care." *Id.* at 850. The court further distinguished the sexual assault in the case from a premises liability claim, stating that a nursing home requires "health care staff" to "make judgments about the care, treatment, and protection of individual patients . . . based on the mental and physical care the patients require" while a premises liability claim involves a duty "of ordinary care with no general medical duty to diagnose and treat." *Id.* at 850–51.

Despite the court's broad statement that the relationship between a health care facility and its patients "involves health care," we do not read the *Diversicare* opinion to mean that all claims by a nursing home resident against a nursing home are necessarily *directly related* to health care. Indeed, the court specifically rejected the characterization of a claim as an HCLC "simply because the landowner is a health care provider." *Id.* at 854; *cf. Terry v. Schiro*, No. 01-07-00060-CV, 2007 WL 2132461, at *3 n.4 (Tex. App.—Houston [1st Dist.] July 26, 2007, pet. denied) (mem. op.) ("Health care liability claims are claims in which the liability derives from the allegedly substandard delivery of health care—not from every aspect of a relationship to a health care provider or

13

facility."). In fact, the Texas Supreme Court set forth examples of non-HCLCs in a nursing home, including inadequate security or negligent maintenance, with more particular examples such as "an unlocked window that gave an intruder access to the facility or a rickety staircase that gave way under her weight." *Diversicare*, 185 S.W.3d at 854.

We find that Johnson's claims are more akin to the non-HCLC examples given in the *Diversicare* opinion than to the sexual assaults in that case. The claims in *Diversicare* involved determination of the proper restraint of nursing home residents. The restraint of nursing home residents is specifically limited to those situations in which it is medically necessary, *see* 40 TEX. ADMIN. CODE 19.601(a) (a nursing home resident "has the right to be free from any physical or chemical restraints . . . not required to treat the resident's medical symptoms"), and thus inseparable from accepted standards of medical care. Johnson's claims do not stem from Omaha's treatment (or lack of treatment) for, to, or on behalf of any resident,[11] but from alleged departures from standards

---

[11]The direct relation of a claim to the treatment of a patient or resident also distinguishes the "faulty equipment" cases cited by Omaha. *See, e.g., Clark v. Tirr Rehab. Ctr.*, 227 S.W.3d 256 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("faulty equipment" claim for injury sustained by patient engaged in physical therapy was recast HCLC for physical therapist's negligent supervision during therapy); *Devereaux*, 2007 WL 852618, at *4 (paraplegic's safety claim for injury falling from stool during transfer from examination bed to stool to wheelchair following an examination was recast HCLC); *Espinosa v. Baptist Health Sys.*, No. 04-05-00131-CV, 2006 WL 2871262, at *4 (Tex. App.—San Antonio Oct. 11, 2006, pet. denied) (mem. op.) ("premises liability" claim for post-surgical patient's injuries when bed trapeze bar failed was recast HCLC for assembly, maintenance, and use of the trapeze bar as prescribed by claimant's doctor and assembled by medical staff). In all of these cases, the health care provider was actively engaged in the provision of health care to a particular patient at the time of injury and the injury derived from the provision of that care (or failures related to it). *Cf.* S.J. OF TEX., 78th Leg., R.S. 5004 (claims must "relate directly to the treatment of a particular patient").

14

of safety, generally, in eradicating spiders on its premises.  The assorted claims do not implicate a medical duty to diagnose or treat.  They seem to be, like a rickety staircase, premises liability claims "of the most pedestrian nature."  *Stradley*, 210 S.W.3d at 775.

Nonetheless, Omaha contends that Johnson's claims are HCLCs because of the necessity of medical expert knowledge since "pest control at a nursing home is not within the purview of a lay person."  Omaha asserts, without evidence or authority, that the "frequency, dosage, areas of application, and type of pesticide used in the presence of nursing home residents—many of whom have a wide range of health care issues that would be affected by pesticide—is not within the understanding of many pest control companies, let alone the average person."  Omaha's conclusory assertions do not persuade us that expert testimony from a medical or health care professional is necessary to prove Johnson's claims.

We find support in the Texas Administrative Code for rejecting Omaha's claim of a medical standard for pest control particular to nursing homes.  The Code, as recognized in *Diversicare*, regulates many areas of nursing home administration.  Pest control is one of the regulated areas.[12] But despite these regulations, there is no statutory or regulatory specialized standard for the details of a nursing home pest control program, only that there be a program.  As opposed to the regulation

---

[12]*See, e.g.,* 40 TEX. ADMIN. CODE 19.309(1)(C) (nursing home must "maintain an effective pest control program so that the facility is free of pests and rodents"); 40 TEX. ADMIN. CODE 19.1701(8)(D) (same); *see also* 40 TEX. ADMIN. CODE 19.323(e) (regulating the storage of insecticides on a nursing home premises); 40 TEX. ADMIN. CODE 19.324 ("Pest control services must be provided by nursing facility personnel or by contract with a licensed pest control company.").

of resident restraint, which as we noted earlier the Code allows only if medically required, the regulation of pests is not couched in medical terms.[13]

We find that the mere fact of regulation does not mean that such regulation (or the regulated area) is related to health care. Here, the pest control regulations do not themselves create an industry safety standard that Johnson must prove has been violated, let alone a safety standard directly related to health care. There is no indication in the record that nursing home pest control involves "judgments made by professionals trained and experienced in treating and caring for patients and the patient populations in their health care facilities." *Diversicare*, 185 S.W.3d at 850. There is no indication pest control judgments are actually, as opposed to theoretically, based on the physical care the patients require or implicate the medical duty to diagnose and treat.

Johnson presents "a premises liability claim in a health care setting that may not be properly classified as a health care liability claim." *Beal*, 240 S.W.3d 282. Johnson's claims are neither integral to nor inseparable from the health care and nursing services provided to Reed. There is no medical expert report required to explain the standard of care or its breach. Johnson's claims are not safety claims directly related to health care, not HCLCs, and not subject to the expert report requirements of the former Section 74.351.

---

[13]Similarly, nursing home windows and stairways are regulated in the Code specifically for safety, but not in medical terms. The regulation of these areas of a nursing home premises for safety did not prevent the Texas Supreme Court from giving rickety stairways and unlocked windows as examples of non-HCLCs. *See Diversicare*, 185 S.W.3d at 854.

We affirm.

Bailey C. Moseley
Justice

Date Submitted: January 16, 2008
Date Decided: February 8, 2008