**OMAHA HEALTHCARE CENTER, LLC, Petitioner,**

v.

**Wilma JOHNSON, on Behalf of the Estate of Classie Mae Reed, Deceased, Respondent.**

No. 08–0231.

Supreme Court of Texas.

July 1, 2011.

Bryan Rutherford, Gregory Norman Zeigler, Jennifer Dawn Leblanc, McDonald Devin, P.C., Dallas, for Omaha Healthcare Center, LLC.

Thomas Matthew Corea, Kenneth Petter Trosclair, The Corea Firm, PLLC, Ryan Matthew McFarlin, McFarlin Yu, PLLC, Jeremy Reade Wilson, The Corea Firm, PLLC, Dallas, for Wilma Johnson.

Justice JOHNSON delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice GREEN, Justice WILLETT, and Justice GUZMAN joined.

In this case we consider whether claims against a nursing home regarding a patient's death alleged to have been caused by a brown recluse spider bite are health care liability claims (HCLCs) that required an expert report to be served. The trial court and court of appeals held that they were not. We disagree.

## I. Background

Wilma Johnson, on behalf of the estate of her deceased sister, Classie Mae Reed, filed suit against Omaha Healthcare Center (Omaha), a nursing home. Johnson alleged that while Reed was being cared for by Omaha she was bitten by a brown recluse spider and died. Johnson asserted that Omaha had a duty to use ordinary care in maintaining its premises in a safe condition and breached its duty by failing to (1) inspect the premises for spider and insect infestations, (2) properly clean the premises, (3) institute proper pest control policies and procedures, and (4) take the necessary actions to prevent insect and spider infestations.

Omaha filed a motion to dismiss on the grounds that Johnson's claims were HCLCs and she did not serve an expert report as required by statute. *See* Tex. Civ. Prac. & Rem.Code § 74.351(a), (b)[1] (stating that an HCLC claimant must

---

[1]. Section 74.351 was amended after Johnson's cause of action accrued, and the prior law is applicable to Johnson's claim. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875, *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590. At the time of Reed's injury, the statute required an expert report to be served within 120 days of the "claim" being filed. It now requires that an expert report be filed within 120 days of the filing of the "original petition." Because the amendment has no impact on our analysis, for ease of reference we will cite the current version of the statute.

serve an expert report within 120 days of filing suit and a trial court shall dismiss the claim if no report is served). Johnson responded that her claims were matters of ordinary negligence and did not fall under the statutory definition of "health care liability claim." The trial court denied Omaha's motion and Omaha filed an interlocutory appeal. *See id.* § 51.014. The court of appeals affirmed. 246 S.W.3d 278. We reverse the judgment of the court of appeals and remand the case to the trial court with instructions to dismiss the case and consider Omaha's request for attorney's fees and costs.

## II. Discussion

■ As relevant to this case an HCLC is

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

*Id.* § 74.001(a)(13). "Health care" is

any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.

*Id.* § 74.001(a)(10); *see Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 847 (Tex.2005) (describing health care as "broadly defined"). "Safety" is not defined in the statute, so "we apply its meaning as consistent with the common law

[which is] the condition of being 'untouched by danger; not exposed to danger; secure from danger, harm or loss.'" *Diversicare,* 185 S.W.3d at 855 (quoting Black's Law Dictionary 1336 (6th ed.1990)).

The court of appeals concluded that the claim was a safety claim and under section 74.001(a)(13), a safety claim must be " 'directly related to health care' to be actionable as an HCLC." 246 S.W.3d at 284. The court then concluded that because Johnson's claims were neither integral to nor inseparable from the health care and nursing services Omaha provided to Reed, they were not HCLCs. *Id.* at 287.

In this Court, Omaha asserts that Johnson's claim is a safety claim directly related to health care and the court of appeals incorrectly determined otherwise.[2] Under such standard, Johnson's claim against Omaha is an HCLC if it is for a departure from accepted standards of safety directly related to "any act ... that should have been performed or furnished by [Omaha] to, or on behalf of [Reed] during [Reed's] medical care, treatment, or confinement." *See* Tex. Civ. Prac. & Rem.Code § 74.001(a)(10), (13).

■ In order to determine whether a claim is an HCLC, we consider the underlying nature of the claim. *Yamada v. Friend,* 335 S.W.3d 192, 196 (Tex.2010). Artful pleading cannot alter that nature. *Id.*

■ The services a nursing home provides to its patients during their confinement include meeting patients' fundamental needs. *See Diversicare,* 185 S.W.3d at 849. Part of the fundamental patient care required of a nursing home is to protect

---

**2.** Omaha does not challenge the court of appeals' conclusion that a safety claim under section 74.001(a)(13) must be directly related to health care. We agree with Omaha that

Johnson's claim is directly related to health care and do not address the issue of whether it must be.

the health and safety of the residents. 40 TEX. ADMIN. CODE § 19.1701; *see id.* § 19.401(b) (providing that nursing home residents have a right to safe, decent, and clean conditions). A nursing home facility "must provide a safe, functional, sanitary, and comfortable environment for residents" and "must . . . maintain an effective pest control program." *Id.* § 19.309(1)(c). In its pest control program a nursing home must "use the least toxic . . . effective insecticides." *Id.* § 19.324.

The court of appeals concluded that just because there are regulations requiring pest control in nursing homes does not mean that the regulations are related to health care. 246 S.W.3d at 286–87. It found "no indication pest control judgments are actually, as opposed to theoretically, based on the physical care the patients require or implicate the medical duty to diagnose and treat." *Id.* at 287.

But "health care" involves more than acts of physical care and medical diagnosis and treatment. It involves *"any act* performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's . . . confinement." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10) (emphasis added). And nursing homes are required to provide more than physical care and treatment. They are required to take actions to provide "quality care" which includes things such as safety of the environment. *See* TEX. HEALTH & SAFETY CODE § 242.001(a)(1), (8).

As noted above, Johnson alleged that Omaha failed to maintain the premises in a safe condition by failing to inspect the premises, failing to properly clean the premises, failing to institute proper pest control policies, and failing to prevent insect and spider infestations. Although Johnson pled that Omaha was liable be-cause it failed to exercise ordinary care to conduct the referenced activities, the underlying nature of her claim was that Omaha should have but did not exercise the care required of an ordinarily prudent nursing home to protect and care for Reed while she was confined there. That is, she alleged that Omaha failed to take appropriate actions to protect Reed from danger or harm while caring for her. *See Diversicare,* 185 S.W.3d at 855. Those claims fell within the statutory definition of a health care liability claim. Because they did, the statute required the suit to be dismissed unless Johnson timely filed an expert report. *See* TEX. CIV. PRAC. & REM.CODE § 74.351(a), (b).

### III. Response to the Dissent

The dissent relies to a large degree on language derived from the dissenting opinions in *Marks v. St. Luke's Episcopal Hospital,* 319 S.W.3d 658 (Tex.2010), and *Diversicare,* and the dissent's interpretation of the statutory definitions of "health care liability claim" and "health care." The dissenting opinions in *Marks* and *Diversicare* did not carry the day in those cases; they do not do so in this case. Further, we disagree with the dissent's interpretation of the statutory language. The dissent opines that interpreting the language of the statute to mean what it simply and plainly says—as we do—will cause confusion. We fail to see how. Consistently interpreting statutory language according to its plain meaning and context, unless that interpretation yields an absurd or nonsensical result, honors the Legislature's intent and reduces confusion by giving legislators, the bar, and ordinary persons confidence that courts will interpret statutes to mean what they say. *See Molinet v. Kimbrell,* —— S.W.3d ——, ——, 2011 WL 182230, (Tex.2011) ("Our primary objective in construing statutes is to give

effect to the Legislature's intent. The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results.") (citations omitted).

It is not absurd or nonsensical for the Legislature to have required that a party filing suit against a health care provider must timely serve a statutory expert report. In a suit against a nursing home—a health care provider—based on allegations that the facility failed to take proper actions it should have "performed or furnished, . . . for, to, or on behalf of a patient during the patient's . . . confinement," a claimant must timely serve a statutory expert report. Johnson did not do so and her claim must be dismissed.

## IV. Conclusion

Johnson's claim is an HCLC and should have been dismissed. Because Omaha requested its attorney's fees and costs in the trial court pursuant to Civil Practice and Remedies Code section 74.351(b)(1), the case must be remanded.

We grant Omaha's petition for review. Without hearing oral argument we reverse the court of appeals' judgment and remand the case to the trial court with instructions to dismiss Johnson's claims and consider Omaha's request for attorney's fees and costs.

Justice LEHRMANN filed a dissenting opinion, in which Justice MEDINA joined.

Justice LEHRMANN, joined by Justice MEDINA, dissenting.

Expert testimony is often critical to assist the trier of fact. *See Salem v. U.S. Lines Co.,* 370 U.S. 31, 32, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962). Complex matters need to be explained to aid in assessing the nature of the claims and separating the meritorious from the frivolous. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). An expert witness may testify regarding "scientific, technical, or other specialized" matters if the expert is qualified and if the expert's opinion is relevant and based on a reliable foundation. Tex.R. Evid. 702; *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 578 (Tex.2006); *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556–57 (Tex.1995).

Our Legislature, in enacting the health care liability claim statute, recognized the importance of expert testimony in medical malpractice suits by requiring that plaintiffs serve, within 120 days, expert reports for each health care provider against whom a liability claim is brought. Tex. Civ. Prac. & Rem.Code § 74.351(a). The Legislature defined a health care liability claim as one "against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant." *Id.* § 74.001(a)(13). In holding that a spider bite in a nursing home is a health care liability claim for which an expert report is required, the Court reaches a result that is contrary to the Legislature's intent, belies common sense, and contorts the role of experts in health care litigation.

The Court has not, at least so far, expressly held that *all* injuries in a health care setting, regardless of any relationship to medical care, must be filed as health care liability claims. But today's opinion does as much implicitly. In doing so, the Court radically departs from our clear assurances that there can be "premises liability claims in a healthcare setting that

may not be properly classified as health care liability claims," *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 854 (Tex.2005), and the plurality's recognition in *Marks v. St. Luke's Episcopal Hospital* that safety-based health care liability claims necessarily implicate medical care standards. 319 S.W.3d 658, 664 (Tex.2010) (plurality opinion). In *Marks*, the plurality noted that the alleged negligence in health care safety claims must be "*inseparabl[y] and integral[ly]*" related to the rendition of medical services. *Marks*, 319 S.W.3d at 664; *see Diversicare*, 185 S.W.3d at 848–49. In applying that standard, we have heretofore considered a number of factors, among them whether a specialized standard in the health care community applies in the particular circumstances; whether the alleged negligence involves medical judgment related to patient care or treatment; and whether expert testimony from a medical professional is necessary to prove a cause of action. *See Diversicare*, 185 S.W.3d at 847–52. But the Court considers none of these limiting factors in the present case, effectively holding that *all* premises claims by injured patients are health care liability claims.

In *Diversicare*, we emphasized that the acts or omissions at issue were inseparable from the provision of health care, carefully distinguishing them from garden-variety negligence claims like those stemming from "an unlocked window" or a "rickety staircase." *Id.* at 854. Similarly, in *Marks*, the plurality's holding that an injury caused by a defective footboard on a hospital bed was a health care liability claim turned on the fact that a hospital bed, unlike a typical one, was "[m]edical equipment specific to [the] particular patient's care or treatment," and thus an "integral and inseparable part of the health care services provided." *Marks*, 319 S.W.3d at 664. The *Marks* plurality noted

that the Legislature could not have intended that safety standards within the statute's scope "encompass all negligent injuries to patients" in light of the statute's "more specific standards of medical and health care." *Id.* In my view, a spider, in any setting, is more akin to a rickety staircase than a condition resulting from medical negligence or defective medical equipment.

In holding that inadequate pest control is a health care safety violation, the Court essentially declares that all injuries in a health care setting are subject to Chapter 74, without explicitly saying so. As a result of the Court's holding, any patient injured in a hospital will be required to file an expert report even though the injury is entirely unrelated to the delivery of health care services. If it had been the Legislature's intent to subject all claims against health care providers to the statute, "it would have defined a 'health care liability claim' to be any claim against a physician or health care provider in a medical or health care setting." *See Drewery v. Adventist Health System/Tex., Inc.*, No. 03–10–00334–CV, 2011 WL 1991763 at n. 4 (Tex.App.-Austin May 20, 2011, no pet. h.). Given the sweeping interpretation of "safety" implicit in the Court's conclusion, I urge the Legislature to clarify whether a safety violation must be related to health care.

The present case is the Court's second opinion in two months to hold that a health care provider's departure from general safety standards gives rise to a health care liability claim. *See Harris Methodist Fort Worth v. Ollie*, 342 S.W.3d 525 (Tex.2011) (per curiam). In *Harris Methodist*, we held that a patient's post-knee-replacement slip and fall on a slick bathroom floor was a health care liability claim. I agreed with the Court's decision because the underlying nature of Ollie's claim—the hospi-

tal's failure to supervise her or warn her of the slick floor—bore on the staff's medical judgment in assessing her post-surgery condition and her ability to safely bathe. *See id.* at 525. Applying *Diversicare*, it was logical to presume that health care providers generally adhere to specialized standards governing post-surgical patient care, including assessing the patient's ability to safely bathe without assistance, necessitating expert testimony on that issue. Likewise, expert medical testimony may have been necessary to prove that lack of supervision or assistance specific to the patient's condition resulted in the injuries. None of those factors are present in *Omaha*.

In *Harris Methodist*, we noted that the underlying nature of the patient's claim determines "whether the claim is for a departure from accepted standards of safety" relating to an act that should have been performed on the patient's behalf during the patient's medical care, treatment, or confinement. *Id.* at 527. Because medical expert testimony would have been necessary on whether the hospital should have provided special equipment or staff supervision to allow the patient to safely bathe, the claim was the type the Legislature intended to be governed by the statute. The same cannot be said, though, of a nursing home's extermination procedures. Wilma Johnson's claim against the nursing home involves the home's failure to keep the premises properly treated for pests, leading to her sister's death as the result of a brown recluse spider bite. The nursing home's alleged negligence did not involve defective medical equipment or a lapse in medical judgment, but instead a general, common-sense duty to keep the premises clean and bug-free. This is not a situation where the jury would be aided by expert medical opinion. No medical judgment or expertise is implicated in determining whether Omaha adopted proper extermination standards.

The Court's holding that Omaha's failure to prevent a spider infestation is a health care liability claim, of course, means that Johnson was required to serve an expert report in order to avoid dismissal. *See* Tex. Civ. Prac. & Rem.Code § 74.351(a). An expert qualified to file a report on the health care provider's departure from accepted standards of care must "practic[e] health care in a field of practice that involves the same type of care or treatment," "ha[ve] knowledge of accepted standards of care for ... the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim[, and be] qualified on the basis of training or experience to offer an expert opinion regarding" those standards. *Id.* § 74.402(b); *see also id.* § 74.351(r)(5)(B). In assessing witness qualifications, the court should look at licenses, certifications, or substantial training or experience "in the area of health care relevant to the claim," as well as active practice in the health care industry relevant to the claim. *Id.* § 74.402(c). In making this determination, the court is permitted to depart from the above criteria only if it determines, and states so on the record, that there is good reason to admit the proffered testimony. *See id.* § 74.402(d).

Applying the Court's holding, Johnson's experts would need to testify on what the applicable standard of pest control would be in providing a safe nursing home environment, whether allowing a spider infestation departs from that standard, and whether that departure caused the patient's injuries. *See id.* § 74.351(a), (r)(6). Presumably, the expert report would outline the standard of care in selecting pest control services for a prudent nursing home, as well as Omaha's breach and causation. *See id.* § 74.351(r)(6) (expert re-

port must state "applicable standards of care, the manner in which the care ... failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed").

Omaha argues that in addition to physician testimony on causation, Johnson had to produce testimony from an "expert qualified to address application of pesticide in the context of a nursing home" to establish the "correct dosage ... to prevent a breach of the standard of care by allowing a brown recluse to harm a resident, without the pesticide harming the resident." It is hard for me to imagine how this expert could be anyone other than a professional exterminator, not the health care practitioner that the statute contemplates. And even if the court were to use the "good cause" exception in section 74.402(d) to qualify an exterminator as an expert on measures necessary to prevent spider infestation, I cannot imagine how the exterminator could be qualified to testify that the nursing home's practices breached a *medical* standard of care. *See Marks*, 319 S.W.3d at 664; *see also Diversicare*, 185 S.W.3d at 854 (suggesting that unsafe conditions unrelated to provision of health care might not be health care liability claims). The Court's imposition of Chapter 74 requirements in a way the Legislature never intended is what leads to this jarring result.

The Court's contorted reading of the statute will disserve both patients and health care providers. As the dissent in *Marks* warned, "[b]y sweeping even simple negligence claims under the umbrella of medical malpractice insurance policies, the Court risks broadening the class of claims that medical malpractice insurance companies must cover." *Marks*, 319 S.W.3d at 686 (Guzman, J., concurring and dissenting). Health care providers will incur higher medical malpractice insurance pre-

miums as insurers adjust their rates to account for more claims attributed to medical malpractice. *See Diversicare*, 185 S.W.3d at 862 (O'Neill, J., dissenting) (noting that providers carry both general and malpractice liability policies, and health care liability claim litigation expenses fall under the malpractice policy). This defeats the very purpose of the statute as expressed by the Legislature, "which is to reduce the cost of medical malpractice insurance in Texas so that patients can have increased access to health care." *Marks*, 319 S.W.3d at 686 (Guzman, J., concurring and dissenting) (citing a previous version of the statute). The uncertain line between premises liability and medical malpractice claims also means that premises liability insurance premiums could be adversely affected. Above all, continuing uncertainty will lead to increased litigation costs, forcing plaintiffs to procure multiple expert reports in cases involving no medical expertise or true health care related claims.

Because the Court's decision will spawn uncertainty and extend health care liability claim treatment to claims that are not "inseparabl[y] and integral[ly]" related to the rendition of medical services, *Marks*, 319 S.W.3d at 664, without regard to legislative intent, I am compelled to respectfully express my dissent.