CHCA BAYSHORE, L.P. d/b/a East Houston Regional Medical Center and Pasadena Bayshore Hospital, Inc., Appellants

v.

Amy RAMOS and Richard Ramos, Appellees.

No. 01–11–00764–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 19, 2012.

Robert Eugene Bell, Christopher David Knudsen, Serpe, Jones, Andrews, Callender & Bell PLLC, Houston, TX, for Appellants.

Keith W. Lapeze, The Lapeze Firm, Noel Anne Lewandos, Houston, TX, Deborah Lee Bradley, Bellaire, TX, for Appellees.

Panel consists of Justices JENNINGS, MASSENGALE, and HUDDLE.

## OPINION

MICHAEL MASSENGALE, Justice.

Appellants CHCA Bayshore, L.P. d/b/a East Houston Regional Medical Center and Pasadena Bayshore Hospital, Inc. (collectively, the "Hospital") bring this statutory interlocutory appeal from the denial of their motion to dismiss under section 74.351 of the Texas Civil Practice and Remedies Code. In one issue, the Hospital contends that the trial court erred because appellees Amy and Richard Ramos asserted a health care liability claim and did not timely serve an expert report.

We reverse the order of the trial court and remand for further proceedings consistent with this opinion.

## Background

Amy Ramos had a dilation and curettage procedure after suffering a miscarriage when she was approximately 12 weeks pregnant. The operative report of Amy's obstetrician indicated that a "specimen was sent to pathology" for testing. Because Amy and her husband wished to hold a funeral, the obstetrician instructed the pathology department to test the specimen and then hold it for the funeral home.

The next day, a funeral home employee went to the Hospital to receive the specimen for burial. After the Ramoses held the funeral, they learned that the Hospital had given the wrong specimen to the funeral home. The buried specimen was exhumed and found to be the amputated toe of another patient. The Ramoses later buried the correct specimen.

The Ramoses sued the Hospital, alleging negligence and negligent infliction of emotional distress. Specifically, they alleged that the Hospital acted negligently with respect to the identification, handling, and disposition of the specimen, in regard to training their employees, and in relation to their policies and procedures. The Hospital filed a motion to dismiss, arguing that the Ramoses had pleaded a health care liability claim governed by Chapter 74 of the Texas Civil Practice and Remedies Code, yet they failed to timely serve an expert report. The Ramoses denied that their claim was a health care liability claim and argued that no expert report was required. In their response to the Hospital's motion to dismiss, the Ramoses argued in part that "there is no specialized standard in the health care community that applies for the pathology department's failure to deliver the correct remains to the funeral home; and there is no medical judgment related to the care or treatment of the fetal remains." After a hearing, the trial court denied the motion to dismiss, and the Hospital filed this interlocutory appeal.

## Analysis

The sole issue in this appeal is whether the Ramoses' claim qualifies as a health care liability claim governed by the Medical Liability Act. See TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.001–.507 (West 2011). A claimant who files a health care liability claim must serve an expert report on each party or his counsel not later than the 120th day after the claimant's original petition was filed. Id. § 74.351(a). If the claimant fails to do so, the trial court must dismiss the health care liability claim on the defendant's motion. Id. § 74.351(b).

In this case, the Hospital moved to dismiss the Ramoses' suit because they were required but failed to file an expert report in support of their alleged health care liability claim. We review a trial court's denial of a motion to dismiss under Chapter 74 of the Texas Civil Practice and Remedies Code for abuse of discretion.

*Am. Transitional Care Ctrs. of Tex. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001). However, when the issue on appeal raises a question of law, such as whether the statute applies to a particular claim, we employ a de novo standard of review. *Tex. W. Oaks Hosp., L.P. v. Williams,* 371 S.W.3d 171, 176–77 (Tex.2012).

"Whether a claim is a health care liability claim depends on the underlying nature of the claim being made." *Yamada v. Friend,* 335 S.W.3d 192, 196 (Tex.2010). Chapter 74 defines a health care liability claim as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(13). The Hospital relies on *Diversicare General Partner, Inc. v. Rubio,* 185 S.W.3d 842 (Tex.2005), and subsequent related cases, to argue that the Ramoses' claims—which concern the handling of a tissue specimen and related training issues—satisfy this definition because they allege a departure from accepted standards of "health care." The Hospital also argues that the Ramoses' claims allege a departure from accepted standards of care for "professional or administrative services directly related to health care."

■ We conclude that the Ramoses' claims are health care liability claims. Regardless of whether *Diversicare* and its progeny support characterizing the Ramoses' claims as ones for a "departure from accepted standards of medical care, or health care," we conclude that a separate aspect of the statutory definition of "health care liability claim"—that term's inclusion of "professional or administrative services directly related to health care"— more naturally captures the essence of the Ramoses' claims.

## I. Professional or administrative services

"Professional or administrative services," as that phrase is used in the Medical Liability Act, are "those duties or services that a physician or health care provider is required to provide as a condition of maintaining the physician's or health care provider's license, accreditation status, or certification to participate in state or federal health care programs." TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(24). The Ramoses alleged that the Hospital was negligent in its failures to properly identify the remains of the fetus, to establish and follow policies and procedures for identifying and surrendering remains, to properly secure and monitor the fetal remains, to train and manage its employees to prevent mislabeling or misidentifying the fetal remains, to establish and implement a comprehensive program to prevent confusion of remains, and to establish and implement a comprehensive program to prevent the *improper surrender of remains.* The crux of these allegations is that the Hospital failed to properly handle, identify, monitor, and dispose of a specimen resulting from a medical procedure.

### a. Mishandling of specimen

Texas hospitals are required to obtain a license prior to admitting patients. *See* TEX. HEALTH & SAFETY CODE ANN. § 241.021 (West 2012); 25 TEX. ADMIN. CODE ANN. § 133.21(a)(1) (2012) (Tex. Dep't of State Health Servs., Hospital License). During the licensing period, a hospital is required to comply with applicable legislative and regulatory requirements. *See* 25 TEX. AD-

MIN. CODE ANN. § 133.21(b); *see generally* TEX. HEALTH & SAFETY CODE §§ 241.001–156 (West 2012) (Texas Hospital Licensing Law); 25 TEX. ADMIN. CODE ANN. §§ 133.1–133.169 (2012) (Hospital Licensing). Among other things, the Texas Administrative Code requires that a hospital "shall maintain directly, or have available adequate laboratory services to meet the needs of its patients." 25 TEX. ADMIN. CODE ANN. § 133.41(h) (Hospital Functions & Servs.). It also requires that a hospital laboratory "shall make provision for proper receipt and reporting of tissue specimens." *Id.* § 133.41(h)(3)(C). And although an exemption is provided for the disposition of fetal remains by transfer to a licensed funeral director, *see id.* § 1.133(a)(2)(F), there are specific regulations applicable to the treatment and disposition of "special waste from health-care related facilities," including fetuses and tissues. *See id.* §§ 1.131–1.137, 1.132(40) (Tex. Dep't of State Health Servs., Definition, Treatment, & Disposition of Special Waste from Health–Care Related Facilities).

■ Hospitals are required to abide by these regulations, and a hospital's license may be denied, suspended, or revoked for failure to comply. *See* TEX. HEALTH & SAFETY CODE § 241.053(a)(1); 25 TEX. ADMIN. CODE ANN. § 133.121(1)(B) (Tex. Dep't of State Health Servs., Enforcement Action). To comply with the general requirements pertaining to hospital laboratories and the specific requirements pertaining to special waste, a hospital must have a means of identifying and storing specimens, before and after testing. Procedures to ensure proper identification and handling of the specimens are necessary to compliance with the regulations pertaining to disposition of these types of specimens. Thus the identification, handling, and ultimate disposal of specimens are services that a health care provider is required to provide as a condition of maintaining its license. Accordingly, we conclude that these functions—identification, handling, and disposal of specimens—are professional or administrative services as contemplated by Chapter 74. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(24).

### b. Negligent training and supervision

The Ramoses also alleged negligence pertaining to the Hospital's training and supervision of its employees and its establishment and maintenance of policies and procedures for labeling, handling, and disposition of specimens. The determination of whether such causes of action are health care liability claims requires an examination of the claims' underlying nature. *Harris Methodist Fort Worth v. Ollie*, 342 S.W.3d 525, 527 (Tex.2011) (per curiam).

The training and supervision of employees, as well as the maintenance of adequate policies, are an inseparable part of fulfilling a hospital's responsibilities for the proper handling of specimens. For the reasons explained above, allegations of these kinds of negligence directly implicate activities that are professional or administrative services under the statute. Accordingly, they too may constitute health care liability claims, so long as the other requirements of the statute are satisfied. *Cf. Diversicare*, 185 S.W.3d at 848, 849–50 (a claim of negligent supervision or failure to train is classified as a health care liability claim when the claim alleges "a departure from accepted standards of medical care or health care if the act or omission complained of is an inseparable part of the rendition of medical services"); *Ollie*, 342 S.W.3d at 527 (similar causes of action alleged for claimed departures from accepted standards of "safety" may also be health care liability claims).

## II. Direct relation to health care

■ In order to give rise to a health care liability claim, the "professional or administrative services" implicated by a cause of action against a health care provider or physician must be "directly related to health care." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13); *see Tex. W. Oaks,* 371 S.W.3d at 184. Chapter 74 defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(10).

In this case, the Hospital's challenged actions were directly related to the health care that Amy received while in the Hospital. First, Amy was unquestionably a recipient of "health care" for purposes of the statute. While she was a patient of the Hospital, Amy underwent "treatment"—a dilation and curettage procedure—which was rendered on her behalf by a health care provider. During the course of Amy's treatment, the Hospital obtained a specimen of fetal remains. Both the dilation and curettage procedure and the removal of the fetal remains qualify as an act or treatment that satisfy the definition of "health care" in section 74.001(a)(10).

Moreover, the alleged mishandling of the specimen that occurred after the dilation and curettage procedure and the removal of the fetal remains was "directly related" to the "health care" received by Amy. The fetal remains were initially obtained during and as a result of her dilation and curettage procedure. The Hospital thus came into possession of the specimen as a direct result of providing health care to Amy. Once the specimen was removed from Amy and it came into the control of the Hospital, the Hospital was obligated to maintain the specimen and ultimately dispose of it in compliance with applicable regulations and the patient's instructions. The Hospital is alleged to have negligently handled the remains. If it did so, that action was an immediate consequence of having performed the procedure that resulted in the Hospital's handling of the remains, and as such, it was directly related to the health care rendered to Amy by the Hospital.

Based upon the statutory definition of "health care" and its reference to treatment performed "during the patient's medical care, treatment, or confinement," *id.* § 74.001(a)(10), the Ramoses contend that the Hospital's challenged actions must have been committed "during the patient's medical care, treatment, or confinement" to qualify as a health care liability claim. *Id.* § 74.001(a)(10), (19) (definitions of "health care" and "medical care"). Because the allegedly tortious act—providing the wrong specimen to the funeral home—occurred after Amy was discharged from the Hospital, the Ramoses thus argue that their claims do not meet the statutory definition of a health care liability claim.

■ We disagree with the Ramoses' interpretation of the statute as it relates to actions arising from professional or administrative services. In the context of such a claim, it is not necessary that the professional or administrative services occur during the patient's medical care, treatment, or confinement. Instead, those services only need be "directly related" to "health care," including treatment that was or should have been performed during the patient's medical care, treatment, or confinement. *See id.* § 74.001(a)(13) (definition of "health care liability claim"); *accord TTHR, L.P. v. Coffman,* 338 S.W.3d 103 (Tex.App.-Fort Worth 2011, no pet.). We hold that the Hospital's professional or administrative services relating to its han-

dling of the fetal remains resulting from Amy's dilation and curettage procedure were directly related to the health care provided to Amy by the Hospital.

## III. Absence of need for medical expert testimony

Finally, the Ramoses contend that they did not allege a health care liability claim because there allegedly is no need for specialized medical expert testimony to prove a claim of negligence with respect to the mishandling of a specimen as alleged in their petition. Their argument that they have alleged negligence that is within the common knowledge of laymen is unavailing.

In *Yamada v. Friend*, 335 S.W.3d 192 (Tex.2010), the Supreme Court of Texas unanimously held that one set of underlying facts cannot separately support health care liability claims and ordinary negligence claims. In *Yamada*, the plaintiffs sued Dr. Yamada and others after their daughter collapsed at a water park and later died from a heart condition. 335 S.W.3d at 193. The plaintiffs alleged that Dr. Yamada, a medical doctor who specialized in emergency medicine, had failed "to properly provide advice and recommendations to the City about its safety practices," including the placement and maintenance of automated external defibrillators at the water park. *Id.* The plaintiffs' pleadings stated claims for both ordinary negligence and negligence based on a breach of an emergency medicine physician's standard of care. *Id.* They did not file a timely expert report. *Id.* The court of appeals dismissed the part of the case relating to the physician's standard of care but refused to dismiss the ordinary negligence claims. *Id.* The Supreme Court reversed, holding that in light of its prior decisions "to the effect that if the gravamen or essence of a cause of action is a

health care liability claim, then allowing the claim to be split or spliced into a multitude of other causes of action with differing standards of care, damages, and procedures would contravene the Legislature's explicit requirements." *Id.* at 197. The Court further noted, "[I]t would be hard to find a health care liability claim in which some action by the health care provider or physician arguably would not be within the common knowledge of jurors, and thus would support a claim for ordinary negligence." *Id.*

 The suggestion that expert testimony is not required to prove the claim is not dispositive of whether it qualifies as a "health care liability claim." Even when expert medical testimony is not necessary, the claim may still be a health care liability claim. *See Tex. W. Oaks*, 371 S.W.3d at 181–82. The statute does not expressly state that a claim must require supporting expert testimony to qualify as a health care liability claim, nor can that requirement by implied from the standard set forth in the statute.

## Conclusion

We conclude that the Ramoses' petition alleges a health care liability claim. Tex. Civ. Prac. & Rem.Code. Ann. § 74.001(a)(13). Because they did not timely serve an expert report, we hold that the trial court erred by denying the Hospital's motion to dismiss. We sustain the Hospital's sole issue.

We reverse the order of the trial court and remand the case to the trial court with instructions to dismiss the Ramoses' claims and for further proceedings consistent with this opinion. *See id.* § 74.351(b).

Justice JENNINGS, dissenting.

TERRY JENNINGS, Justice.

Because the claim of appellees, Amy and Richard Ramos, against appellants, CHCA Bayshore, L.P., doing business as East Houston Regional Medical Center, and Pasadena Bayshore Hospital, Inc., for negligent infliction of emotional distress resulting from the mishandling of the remains of their unborn child is not a claim in which they seek to establish "medical liability," i.e., a "health care liability claim" as actually defined by the Texas Legislature, I respectfully dissent. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(13) (Vernon 2011).

Under chapter 74 of the Texas Civil Practice and Remedies Code, which is expressly entitled, **"Medical Liability,"** the Texas Legislature defines a **"[h]ealth care liability claim"** as

> [A] cause of action against a health care provider or physician *for* treatment, lack of treatment, or *other claimed departure from accepted standards of* medical care, or health care, or *safety or professional or administrative services directly related to health care,* which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

*Id.* § 74.001(a)(13) (emphasis added). The legislature further defines **"health care"** as

> [A]ny act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider *for, to, or on behalf of a patient during the patient's medical care, treatment or confinement.*

*Id.* § 74.001(a)(10) (emphasis added).

In regard to the term "directly related," the restrictive adjective "related" is defined as "belonging to the same family, group, or type; connected" and "associated

with the specified item or process, esp. causally: *income-related benefits.*" THE NEW OXFORD AMERICAN DICTIONARY 1437(2001). The restrictive adverb "directly" is defined as

> In a direct manner or way .... 1. b. Straightforwardly; pointedly; simply; plainly; correctly; rightly.... 4. Completely, absolutely, entirely, exactly, precisely, just....

THE COMPACT OXFORD ENGLISH DICTIONARY 439 (2nd ed.1993). In short, "directly" means "with nothing or no one between." THE NEW OXFORD AMERICAN DICTIONARY 483.

Accordingly, in assessing whether the claim of a plaintiff brought against a physician or health care provider is a "health care liability claim," as meant by the Texas Legislature in chapter 74 as one seeking to establish actual "medical liability," a court must very simply determine whether the plaintiff's cause of action is one "for" a physician or health care provider's

(1) "treatment,"

(2) "lack of treatment, or"

(3) "other claimed departure from accepted standards of"

(a) "medical care, or"

(b) "health care, or"

(c) "safety or professional or administrative services *directly related* to health care."

TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(13) (emphasis added). In regard to "other claimed departure[s] from accepted standards" of "safety or professional or administrative services," the plaintiff's cause of action, by the legislature's express definition, must specifically be *"directly related"* to the provision of *"health care"* i.e.:

(1) An "act or treatment"

(a) "performed or furnished, or"

(b) "that should have been performed or furnished,"

(2) "by any health care provider"

(3) *"for, to, or on behalf of a patient"*

(4) *"during the patient's"*

(a) *"medical care,"*

(c) *"treatment,"* or

(c) *"confinement"*

*Id.* § 74.001(a)(10) (emphasis added).

Here, the Ramoses' cause of action for negligent infliction of emotional distress for the mishandling of the remains of their unborn child, which actually occurred after Mrs. Ramos had already received properly administered medical treatment, is not one seeking to establish liability for a "medical" injury to either the unborn child or to Mrs. Ramos as patients. Their claim does not concern "treatment" or "lack of treatment." The Ramoses are not seeking medical-liability damages for a "claimed departure from accepted standards" of "medical care" or "health care." Nor, contrary to the majority's opinion, are they asserting a claim against appellants for their "departure from accepted standards" of "safety or professional or administrative services *directly related to health care.*" *See id.* § 74.001(a)(13) (emphasis added). The Ramoses are not complaining about an "act or treatment performed or furnished, or that should have been performed or furnished, ... for, to, or on behalf of a patient *during the patient's medical care, treatment, or confinement.*" *See id.* § 74.001(a)(10) (emphasis added). Thus, their cause of action for the mishandling of their unborn child's remains is not "directly related" to the provision of health care to either the mother or the unborn child. Their cause of action simply does not fall within the Texas Legislature's definition of a "health care liability claim." The Ramoses are not at all seeking to establish appellants' medical liability for the negligent provision of "health care." They are seeking mental anguish damages because someone, *after* Mrs. Ramos had received medical treatment, mixed up the remains of their unborn child with another person's toe.

Regardless of the plain language of the legislature's definition of "health care liability claim," appellants assert that the Ramoses have sued them to establish medical liability for a claimed departure from accepted standards of professional or administrative services directly related to health care. In support of their assertion, **appellants rely upon** *Omaha Healthcare Center, L.L.C. v. Johnson,* 344 S.W.3d 392, 394–95 (Tex.2011) (holding that claim against nursing home regarding patient's death from spider bite "fell within the statutory definition of a health care liability claim"), *Yamada v. Friend,* 335 S.W.3d 192, 196–98 (Tex.2010) (holding that claim against doctor for negligently advising water park regarding defibrillators constituted health care liability claim), *Marks v. St. Luke's Episcopal Hospital,* 319 S.W.3d 658, 663–64 (Tex.2010) (holding that claim against hospital regarding patient's fall caused by defective footboard on hospital bed constituted health care liability claim), and *Diversicare General Partner, Inc. v. Rubio,* 185 S.W.3d 842, 849–55 (Tex.2005) (holding that claim that hospital provided inadequate supervision, leading to patient's sexual assault by another patient, constituted health care liability claim). Although appellants' reliance on these opinions is not entirely misplaced, the opinions are not controlling given the unique allegations presented here. In the instant case, the alleged act of negligence, i.e., the mishandling of the remains of the unborn child, occurred after and not *"during* [a] patient's medical care, treatment or confinement." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(10) (emphasis added). And the Ramoses are not alleging an act of negligence regarding any testing done on the remains.

It is true that the Texas Supreme Court, rather than relying upon the express, plain language of the legislature's definition of "health care liability claim" as outlined above, has instead established its own definition with a three-pronged test:

[A] health care liability claim consists of three elements. First, a physician or health care provider must be the defendant. Second, the suit must be about the patient's treatment, lack of treatment or some other departure from accepted standards of medical care or health care or safety. And, third, the defendant's act, omission, or other departure must proximately cause the patient's injury or death.

*Marks*, 319 S.W.3d at 662 (emphasis added).

The supreme court's test is problematic [1] given the fact that it makes no reference to the restrictive adjective "related" with the more restrictive adverb "directly," i.e., "with nothing ... between." Instead, the supreme court more generally states that anything that could be described to be "about" "safety" qualifies as a health care liability claim.

Moreover, the supreme court's definition of "health care liability claim," consisting of "three elements," does not take into account the specific language actually used by the legislature in its definition of "health care," which includes an "act" performed or furnished, or that should have been performed or furnished, by a health care provider *"for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement"* Tex.

CIV. PRAC. & REM.CODE ANN. § 74.001(a)(10) (emphasis added). Such an "act," in regard to a plaintiff's cause of action for "medical liability" for a claimed departure from accepted standards of "safety or professional or administrative services directly related to health care," would necessarily include medical testing and diagnostic services, the collection and proper dissemination of the patient's status and test results and pertinent information, and, in regard to a patient who is a danger to himself, proper restraint or confinement of the patient for his safety. These services would constitute an "act" by a health care provider *"for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement."* *See id.* (emphasis added). Such an "act" would not include routine facility pest control, janitorial services, general maintenance of items like the footboard of a hospital bed, or security and safety services not "directly related to health care."

The Texas Legislature has, through its choice of plain language, manifested its intent that chapter 74 of the Texas Civil Practice and Remedies Code apply only to causes of action in which a plaintiff is seeking to establish actual and real "medical liability," as the statute itself is entitled. Such a cause of action must really be one for an injury or death proximately caused by a health care provider or physician's actual

(1) "treatment,"

(2) "lack of treatment, or"

(3) "other claimed departure from accepted standards of"

---

1. Former Texas Court of Criminal Appeals Presiding Judge John F. Onion warned long ago about fashioning such tests:

We do not need another three-prong test, a two-step analysis or a multi-stage standard in our decisional law. There are enough of those now to decorate a Christmas tree.

*Ex Parte Williams*, 704 S.W.2d 773, 785 (Tex. Crim.App.1986) (Onion, P.J., concurring in part and dissenting in part). His warning seems particularly pertinent when it comes to construing the plain language actually used in our constitution and statutes.

(a) "medical care, or"

(b) "health care, or"

(c) "safety or professional or adminis-
trative services *directly related to
health care.*"

*Id.* § 74.001(a)(13) (emphasis added).

Regardless, consistent with its previous
holdings in *Diversicare* and its progeny, a
majority of the Texas Supreme Court has
recently held that "the safety component
of [health care liability claims] *need not be
directly related to the provision of
health care.*" *Tex. West Oaks Hosp. v.
Williams,* No. 10–0603, 2012 WL 2476807,
at *11 (Tex. June 29, 2012) (emphasis add-
ed). In explaining the basis of this ex-
traordinary holding, the court asserts that
the phrase "directly related to health care"
only modifies the terms immediately be-
fore it, i.e., "professional or administrative
services." *Id.* at *10–11. Thus, it con-
cludes that the phrase "directly related to
health care" does not modify the word
"safety." *Id.* at *11. Respectfully, as re-
vealed above, the premise—the sole foun-
dation—of the court's conclusion is objec-
tively false.

In order to reasonably conclude that the
phrase "directly related to health care"
does not modify the word "safety," one has
to read the word "safety" as if it were in a
clause separate and apart from the clause
"or safety or professional or administrative
services directly related to health
care...." The only way that one might
possibly read section 74.001(13) as does
the majority of the supreme court would
be if the legislature had included a comma
directly after the word "safety," intention-
ally separating it from the rest of the
clause in which it is actually included.
And this the legislature did not do. As
revealed above, a plain reading of the sec-
tion, as it is actually written, reveals that
the legislature did not at all intend to
separate the word "safety" from the clause

"or safety or professional or administrative
services directly related to health
care...." By the use of its plain language
in one clause, the legislature intended that
the words "services directly related to
health care" modify the words "safety,"
"professional," and "administrative." If it
had intended otherwise, it would not have
included all of these words in the same
clause.

Accordingly, in order to constitute a
"health care liability claim" as defined by
the Texas Legislature, a cause of action
must be (1) "for treatment," (2) for "lack of
treatment," (3) for "other claimed depar-
tures from accepted standards of medical
care," (4) for "other claimed departures
from accepted standards of ... health
care," or (5) for "other claimed departures
from accepted standards of" safety ser-
vices, professional services, or administra-
tive services *"directly related to health
care."* TEX. CIV. PRAC. & REM.CODE ANN.
§ 74.001(a)(13) (emphasis added). In oth-
er words, contrary to the supreme court's
reading of the statute and recent holding,
the Texas Legislature has expressly pro-
vided that all claims to establish "medical
liability," defined as "health care liability
claim[s]," must be for claims "directly re-
lated to health care." *See id.*

As has been noted before by several
members of the supreme court, its con-
struction and application of the legisla-
ture's definition of "health care liability
claim" is in fact at odds with the express
and plain language actually used by legis-
lature in defining the term. *See Williams,*
371 S.W.3d 171, 2012 WL 2476807, at *19–
22 (Lehrmann, J., dissenting; joined by
JJ. Medina and Willett); *Johnson,* 344
S.W.3d at 396–99 (Lehrmann, J., dissent-
ing; joined by J. Medina); *Marks,* 319
S.W.3d at 674–86 (Jefferson, C.J., concur-
ring in part and dissenting part; joined by
JJ. Green, Guzman, and Lehrmann); *Id.*

at 686–87 (Guzman, J., dissenting); *Diversicare*, 185 S.W.3d 842, 861–67 (O'Neill, J. dissenting; joined by JJ. Brister and Green). As illustrated in these dissenting opinions, at least six of the current members of the Texas Supreme Court have, at some time or another, disagreed with a majority of the court's construction and application of the term "health care liability claim."

Nevertheless, the supreme court's opinions, no matter how erroneous, controversial, or divided that they may be, constitute binding precedent. And there is a "strong presumption" against overruling precedent. *Gutierrez v. Collins*, 583 S.W.2d 312, 317 (Tex.1979). Absent compelling reasons, courts should avoid overturning their opinions because "the legitimacy of the judiciary rests in large part upon a stable and predictable decision making process"; without adherence to precedent, no question of law would ever be considered resolved. *Weiner v. Wasson*, 900 S.W.2d 316, 320 (Tex.1995).

However, compelling reasons to overturn precedent do exist in limited circumstances, such as when the preceding decision itself is incorrect or unconstitutional, there is conflicting precedent, the decision has been undercut by the passage of time, the precedent creates inconsistency and confusion, or the decision consistently creates unjust results. *See Hammock v. State*, 46 S.W.3d 889, 892–93 (Tex.Crim. App.2001); *see also In re Columbia Med. Ctr. Of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 218 (Tex.2009) (O'Neill, J., dissenting); *Bowman Biscuit Co. v. Hines*, 151 Tex. 370, 376, 251 S.W.2d 153, 155 (1952) (Garwood, J., dissenting).

Here, there are indeed compelling reasons for the Texas Supreme Court to overrule *Diversicare* and its progeny. First, and most important, as outlined above, the supreme court's definition of "health care liability claim" is at odds with the Texas Legislature's actual definition; thus, it is objectively incorrect. Chief Justice Jefferson has noted that, as the supreme court itself has "often explained,"

> Courts must take statutes as they find them. More than that, they should be willing to take them as they find them. They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language, and not elsewhere. They are not the law-making body. They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law. It must be an interpretation which expresses only the will of the makers of the law, not forced nor strained, but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain.

*Diversicare*, 185 S.W.3d at 860 (Jefferson, C.J., concurring in part and dissenting in part) (quoting *Simmons v. Arnim*, 110 Tex. 309, 220 S.W. 66, 70 (Tex.1920), *quoted in St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex.1997), *Republic-Bank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex.1985), and *Tex. Highway Comm'n v. El Paso Bldg. & Constr. Trades Council*, 149 Tex. 457, 468, 234 S.W.2d 857, 863 (1950)). Straightforward statutory construction ensures that everyone is able "to rely on the plain language of a statute to mean what it says." *Fitzgerald v. Advanced Spine Fixation Sys.*, 996 S.W.2d 864, 866 (Tex.1999). However, when courts "abandon the plain meaning of words," their "statutory construction rests upon insecure and obscure foundations at best." *State v. Jackson*, 376 S.W.2d 341, 346 (Tex.1964) (quoting *State Bd. of Ins. v. Betts*, 158 Tex. 612, 615, 315 S.W.2d 279, 281 (1958)).

Second, as noted above, four of the five supreme court opinions addressing the meaning and application of the terms "health care liability claim" and "health care" have drawn well-reasoned dissents. In their dissent in *Diversicare* in 2005, Justices O'Neill, Brister, and Green warned against too broad of an interpretation of the definition of a "health care liability claim" and "sweep[ing] even ordinary negligence claims into the ambit of [medical liability]." 185 S.W.3d at 862–63 (O'Neill, J., dissenting; joined by JJ. Brister and Green). In 2010, Justice Guzman further warned against "sweeping even simple negligence claims under the umbrella of medical malpractice." *Marks,* 319 S.W.3d at 686 (Guzman, J., concurring in part and dissenting part). She noted that the supreme court risked "thwart[ing] the very purpose" of chapter 74, "which is to reduce the cost of medical malpractice insurance in Texas so that patients can have increased access to health care." *Id.*

Recently, in *Williams,* Justices Lehrmann, Medina, and Willett warned that the majority of the supreme court has created "[a] whole new world" by misinterpreting the express language used by the legislature to define "health care liability claim" as including claims not directly related to the provision of health care. 371 S.W.3d 171, 2012 WL 2476807, at *18 (J. Lehrmann, dissenting; joined by JJ. Medina and Willett). They noted that the court's definition "is so broad that almost any claim against a health care provider can now be deemed a health care liability claim" even though the claim may not at all be one to establish medical liability. *Id.* at *24. In response, the majority of the supreme court opined that the *Williams* dissenters' construction of the definition—requiring that a health care liability claim actually be "directly related" to the provision of health care to establish "medical liability"—is "nonsensical." *Id.* at *10, 13–18. Howev-

er, respectfully, the court's definition, when viewed objectively as illustrated above, does not comport with reality.

Time has now proven beyond all doubt that the dissenters were right—the definition of "health care liability claim" as used by the supreme court in *Diversicare* and its progeny has swallowed up virtually every cause of action to be made against a physician or health care provider no matter how far removed it may be from the actual provision of health care for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement. *See id.* at *18 (Lehrmann, J., dissenting) (noting that supreme court's holding that "employee's claims against his employer for providing an unsafe workplace and inadequate training are health care liability claims" reveals that " '[a] whole new world [of health care liability claims], hinted by opinions in the last few years, is here.' ") (quoting *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 470 (Tex.2008) (Wainwright, J., dissenting)); *see also Johnson,* 344 S.W.3d at 396 (Lehrmann, J., dissenting) ("In holding that inadequate pest control [constitutes] a health care safety violation, the Court essentially declares that all injuries in a health care setting are subject to chapter 74, without explicitly saying so. As a result of the Court's holding, any patient injured in a hospital will be required to file an expert report even though the injury is entirely unrelated to the delivery of health care services. If it had been the Legislature's intent to subject all claims against health care providers to the statute, 'it would have defined a "health care liability claim" to be any claim against a physician or health care provider in a medical or health care setting.' ") (quoting *Drewery v. Adventist Health Sys./Tex., Inc.,* 344 S.W.3d 498, 503 & n. 4 (Tex.App.-Austin 2011, pet. filed)).

.

Third, the Texas Supreme Court's definition of "health care liability claim" is not only at odds with the Texas Legislature's actual definition, it has necessarily proven unworkable, resulting in inconsistency, confusion in its application, and more litigation.

Finally, as illustrated by the above dissenting opinions, the application of the supreme court's definition of what constitutes a "health care liability claim" has consistently created manifestly unjust results. Legitimate, ordinary, and simple negligence and premises-liability claims, not at all related to the provision of health care, have been dismissed simply because the plaintiffs did not hire an "expert" to write a report detailing what would be quite obvious to lay persons. *See John-son*, 344 S.W.3d at 396 (J. Lehrmann, dissenting) ("In holding that a spider bite in a nursing home [constitutes] a health care liability claim for which an expert report is required, the Court reaches a result that is contrary to the Legislature's intent, belies common sense, and contorts the role of experts in health care litigation."). The bottom line is that the supreme court's objectively incorrect definition of "health care liability claim" is being used as a "gotcha" to dismiss ordinary and simple negligence and premises-liability claims that, as alleged, are not frivolous and have merit.

In other words, although an "expert" report in ordinary negligence and premises-liability cases made against physicians or health care providers is not at all necessary to evaluate whether a plaintiff's claim is frivolous, the plaintiff, given the supreme court's definition, must nevertheless hire an "expert" to write a report and then provide the meaningless report to defense counsel for the sole purpose of avoiding the dismissal of the lawsuit. The requirement of such a meaningless act truly places form over substance, belittles the practice of law, and serves only to undermine the Rule of Law. It certainly does not serve to uphold the integrity and legitimacy of our judicial institutions. *See Weiner*, 900 S.W.2d at 320.

Accordingly, I respectfully request that the Texas Supreme Court overrule *Diversicare* and its progeny, adopt the Texas Legislature's actual definitions of "health care liability claim" and "health care" as quoted and outlined above, and put an end to the manifestly unjust results that necessarily flow from requiring plaintiffs to serve upon defense counsel a meaningless "expert" report for ordinary negligence and premises-liability claims made against physicians and health care providers.

Even if the supreme court declines to overrule *Diversicare* and its progeny, the Ramoses' factually-specific claim for negligent infliction of emotional distress is not controlled by *Diversicare* and its progeny. Contrary to the majority's opinion, the trial court's order denying appellants' motion to dismiss the Ramoses' claim should be affirmed because the Ramoses are not asserting a claim against appellants for their departure from accepted standards of professional or administrative services *directly related to health care*. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(13) (emphasis added). They simply are not complaining about an "act or treatment performed or furnished, or that should have been performed or furnished, ... for, to, or on behalf of a patient *during the patient's medical care, treatment, or confinement*." *See id.* § 74.001(a)(10) (emphasis added).