COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



TENET HOSPITALS LIMITED, a TEXAS LIMITED PARTNERSHIP D/B/A THE HOSPITALS OF PROVIDENCE MEMORIAL CAMPUS,

§

§

§

Appellant,

§

v.

§

ASHLEE M. BALDERRAMA and ALEJANDRO J. MARTINEZ,

Appellees.

No. 08-23-00263-CV

Appeal from

County Court at Law No. 3

of El Paso County, Texas

(TC# 2023DCV2379)

## **OPINION**

Appellant Tenet Hospitals Limited, d/b/a The Hospitals of Providence Memorial Campus (Providence) challenges the trial court's preliminary determination that Ashlee M. Balderrama and Alejandro J. Martinez's post-mortem negligence claim is not a "health care liability claim" under the Texas Medical Liability Act (TMLA). Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001–507. To test that order we focus on this narrow question: are a hospital's professional or administrative services attendant to an autopsy "directly related to health care" when the autopsy is performed on a person who expired while a patient in the hospital? We answer that question on the very limited record before us and for the sole purpose of deciding whether claimants suing over alleged breaches of those professional or administrative services must file an expert report as required by

1

the TMLA. For the following reasons, we answer yes to that narrow question and reverse the order below.

## I. BACKGROUND[1]

Ashlee Balderrama and Alejandro Martinez (collectively, "the Parents") are married and share three children. When Ashlee was pregnant with their fourth child—a son, who they named Aiden—the family received his devastating diagnosis of trisomy 18.[2] The family understood Aiden's condition to be terminal. Ashlee gave birth to Aiden on April 12, 2023 at Providence by a caesarian section. Aiden died a few hours later. At oral argument, the Parents agreed that during his brief life, Aiden was a patient at Providence.

When Ashlee's doctor discussed performing an autopsy on Aiden, she "made it clear . . . that she did not want an invasive autopsy or for Aiden to be cut in any way since all parties already knew that Aiden died due to trisomy 18." But Ashlee orally agreed to a non-invasive autopsy after her doctor described it as limited to a visual examination and medical imaging. She later signed an autopsy consent form in which she limited her consent to only a "non[-]invasive autopsy." She again confirmed with the nurse who co-signed the consent form that "the autopsy would not involve any cutting."

While at Aiden's viewing about a week later, the Parents discovered an invasive autopsy had been performed and some of Aiden's organs were missing. They immediately called Providence, where a patient safety officer told them that the invasive autopsy had been necessary

---

[1] Given the limited record at this stage in the proceedings, the facts described here are as alleged in the petition. Providence recounts essentially the same statement of facts in its appellate brief but notes that the facts "are not necessarily undisputed for other purposes" beyond this appeal. At argument, Providence made clear it disputes many of the basic underlying facts, including whether a Providence employee performed the autopsy.

[2] Trisomy 18, or Edwards syndrome, is a chromosomal disorder that causes severe growth and developmental delays. When a trisomy 18 diagnosis is present, most pregnancies end in miscarriage or stillbirth, and the survival rate for babies born with trisomy 18 is low. CLEVELAND CLINIC, Edwards Syndrome (Trisomy 18), https://my.clevelandclinic.org/health/diseases/22172-edwards-syndrome (last visited June 25, 2024).

to "determine cause of death," and Ashlee's consent form has been "misinterpreted." Providence later returned Aiden's remaining organs to the funeral home, where he was finally cremated.

The Parents sued Providence, asserting a negligence claim that sought mental anguish damages. They alleged Providence negligently mishandled Aiden's body, failed to prevent Aiden's autopsy and organ removal, and improperly kept Aiden's organs until the Parents demanded their return. Their petition states that Providence "had a duty to exercise the degree of care that a reasonably prudent medical provider would use to avoid harm to others under the circumstances . . . including preventing Aiden's autopsy, communicating Aiden's cause of death and Ms. Balderrama's limited Consent Form, returning Aiden's bloody body in a manner presentable and suitable for return to his parents, and returning Aiden's body with his organs intact to allow for proper burial. Defendant Providence violated this duty."

After Providence invoked the protections of the TMLA in its answer, the Parents moved for a preliminary determination of whether their claims are health care liability claims under that statute, arguing that they are not. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.353(a) ("On motion of a claimant filed not later than 30 days after the date each defendant's original answer is filed, a court may issue a preliminary determination regarding whether a claim made by the claimant is a health care liability claim for the purposes of [the expert-report requirement].").[3] Providence

---

[3] Section 74.353 was added in part to remedy the harsh result when a plaintiff sues a health care provider and erroneously concludes that the claim is not a "health care liability claim" for the purposes of the Act's expert report requirement. *See* Bill Analysis, Tex. S.B. 232, 87th Leg., R.S. (2021) ("[S]ometimes, potentially meritorious claims are dismissed because claimants fail to serve an expert report, not realizing that their claim is an HCLC."); s*ee e.g.*, *Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 756 (Tex. 2014) (ordering dismissal of claims arising out of allegedly improper laser hair removal because they were health care liability claims and no expert report had been filed); S*immons v. Outreach Health Cmty. Care Services, L.P.*, 511 S.W.3d 163, 166 (Tex. App.—El Paso 2014, pet. denied) (dismissing with prejudice claim of nursing assistant injured while moving patient for failure to file required expert report under the TMLA). Under Tex. Civ. Prac. & Rem. Code Ann. § 74.353, a plaintiff may seek a preliminary answer to question of whether the claim is a health care liability claim for the purpose of knowing whether a report is required or not. *Id.* § 74.353(f) ("A preliminary determination under this section applies only to the issue of whether a claimant is required to serve an expert report under Section 74.351."). We express no opinion on whether this preliminary determination interplays with other provisions of the TMLA, other than the expert report requirement.

3

responded, arguing that the claims are health care liability claims. After a hearing on the motion, the trial court granted the Parents' motion, ordering that their claims are not health care liability claims under the TMLA. Providence brought this accelerated interlocutory appeal under § 74.353(d). *See id.* § 51.014(a)(15) (permitting interlocutory appeal from order making a preliminary determination on a claim under § 74.353).

## II. DISCUSSION

### A. The TMLA and health care liability claims

In response to the "medical malpractice insurance crisis" of the 1970s, the Texas Legislature enacted the Medical Liability and Insurance Improvement Act (MLIIA) to reduce the "excessive frequency and severity of health care liability claims in a manner that would not unduly restrict a claimant's rights any more than necessary to deal with the crisis." *Rogers v. Bagley*, 623 S.W.3d 343, 348–49 (Tex. 2021) (cleaned up). The Legislature replaced the MLIIA with the TMLA in 2003. *Id.* at 349. "The TMLA effectuates the Legislature's goal of deterring frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." *Id.* (cleaned up). Health care liability claims under the TMLA are subject to various statutory rules, including the requirement that a plaintiff serve the defendant with an expert report at the beginning of her suit. Tex. Civ. Prac. & Rem. Code Ann. § 74.351.

Whether a claim is a health care liability claim under the TMLA is a legal question that we review de novo. *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 501 (Tex. 2015). In answering that question, "we examine the underlying nature and gravamen of the claims, rather than the way it is pleaded." *CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 534 (Tex. 2016). That is, we "focus on the set of operative facts 'underlying the claim' that are relevant to the alleged injury, not on how 'the plaintiff's pleadings describ[e] the facts or legal theories

4

asserted.'" *Collin Creek Assisted Living Ctr., Inc. v. Faber*, 671 S.W.3d 879, 885 (Tex. 2023) (quoting *Loaisiga v. Cerda*, 379 S.W.3d 248, 255 (Tex. 2012)). The TMLA's "broad language" indicates the "legislative intent for the statute to have expansive application." *Loaisiga*, 379 S.W.3d at 256.

A health care liability claim has three essential elements: (1) the defendant is a physician or health care provider; (2) the claim is for treatment, lack of treatment, or another alleged departure from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's act or omission proximately caused the claimant's injury or death. *Faber*, 671 S.W.3d at 886 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13)). Only the second element is contested here, and the parties agree that we need focus only on the relevant statutory language "professional or administrative services directly related to health care." The Parents further concede that an autopsy can involve professional or administrative services as defined by the TMLA.[4] *See Carswell*, 505 S.W.3d at 535 (noting hospital could lose its license if it violated various state regulations governing autopsies and concluding post-mortem claims based on an autopsy thus alleged a departure from accepted standards of "professional or administrative services"); *CHCA Bayshore, L.P. v. Ramos*, 388 S.W.3d 741, 744–45 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (same). So the question here boils down to whether the professional or administrative services pertaining to Aiden's autopsy were "directly related to health care."

---

[4] The TMLA defines "professional or administrative services" as "those duties or services that a physician or health care provider is required to provide as a condition of maintaining the physician's or health care provider's license, accreditation status, or certification to participate in state or federal health care programs." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(24).

### (1) "Directly related to"

The term "directly related to" is not defined in the TMLA, but the Texas Supreme Court has recently told courts how to construe the term:

> The Act does not define "directly related to," so we look to the words' common meanings. "Direct" or "directly," as most applicable here means "without the intervention of a medium or agent" or "immediately." "Related" is commonly defined as "[c]onnected in some way; having relationship to or with something else." When those definitions are combined, they yield the conclusion that the plain and common meaning of the phrase "directly related to" is "an uninterrupted, close relationship or link between the things being considered."

*Carswell*, 505 S.W.3d at 535–36 (dictionary and case citations omitted).

### (2) Health care

The TMLA defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10). "Medical care" is defined as "any act defined as practicing medicine under Section 151.002, Occupations Code,[5] performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement." *Id.* § 74.001(a)(19). Though the TMLA does not define either "treatment" or "patient," the Texas Supreme Court has noted that "both have ordinary meanings that do not require the active provision of medical care by a physician—much less a physician furnished by the health care provider." *Faber*, 671 S.W.3d at 890–91. "Specifically, 'treatment' includes management and care to ameliorate a medical condition, and a 'patient' includes a recipient of professional services directed toward the protection of health." *Id. at 891*.

---

[5] Section 151.002(a)(13) of the Occupations Code defines "practicing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who [ ] publicly professes to be a physician or surgeon; or [ ] directly or indirectly charges money or other compensation for those services."

**B. Whether these claims are governed by the TMLA**

**(1) Providence's arguments**

Providence argues that claims arising from an invasive autopsy performed beyond the scope of consent are health care liability claims under the TMLA and the trial court erred by determining otherwise. Further, Providence argues that because Aiden was a patient and received care at the hospital before he died, there is a nexus between the provision of health care and the professional or administrative service (i.e., the autopsy). In support of its position, Providence primarily relies on two cases: *CHCA Bayshore, L.P. v. Ramos* and *CHRISTUS Health Gulf Coast v. Carswell*.

In *Ramos*, a woman suffered a miscarriage at about 12 weeks, and underwent a dilation and curettage procedure. 388 S.W.3d at 743. Because she and her husband wanted to hold a funeral, the doctor who performed the procedure instructed the hospital's pathology department to test the fetal remains, then hold the specimen for the funeral home. *Id.* After the funeral, the couple learned that the hospital gave the funeral home the wrong specimen; thinking the fetal remains were of their child, they had in fact buried the amputated toe of another patient. *Id.* The hospital later returned the fetal remains to the couple. *Id.*

The couple sued, urging that the hospital was negligent in establishing and following procedures related to handling, identifying, monitoring, and disposing of a specimen from a medical procedure, and that this was not a health care liability claim governed by the TMLA. *Id.* at 743–44. The hospital argued that the couple's claims alleged a departure from accepted standards of "health care" and "professional or administrative services directly related to health care." *Id.* at 744.

7

The *Ramos* majority concluded that the hospital's alleged conduct was directly related to the care that the woman received in the hospital. *Id.* at 745–46. That is, the hospital's alleged negligent mishandling of the fetal remains was "an immediate consequence of having performed the procedure that resulted in the Hospital's handling of the remains, and as such, it was directly related to the health care rendered to [the woman] by the Hospital." *Id.* at 746. The court thus found unpersuasive the couple's argument that the mishandling of the remains occurred after the woman's medical treatment ended. *Id.*

Providence also relies on the Texas Supreme Court's decision in *Carswell*.[6] In that case, the plaintiff alleged the hospital (1) committed acts of medical malpractice that lead to the death Jerry Carswell; and (2) improperly obtained his wife's approval to perform an autopsy. *Carswell*, 505 S.W.3d at 530. For the autopsy claim, the wife contended the hospital fraudulently obtained her consent for a private autopsy in a related medical facility and moved the body there without the medical examiner's permission. *Id.* at 534–35. She claimed the hospital orchestrated the autopsy to cover-up its alleged malpractice. *Id*. The jury did not find that medical negligence caused Jerry's death, but it did find the hospital liable on the autopsy related claims. The issue before the Texas Supreme Court was whether the autopsy related claims were health care liability claims under the TMLA, because if they were, the autopsy claims were barred by limitations.

To answer that question, the Court had to decide whether the autopsy claims were directly related to health care based on the TMLA's definitions of "health care" and "medical care." *Id.* at 535. And the Court articulated a definition important here: "directly related to" means "an uninterrupted, close relationship or link between the things being considered." *Id.* at 535–36. The Court noted that autopsy claim hinged on the allegation that the hospital obtained the plaintiff's

---

[6] And as we explain below, the Parents likewise believe *Carswell* supports their position.

consent for the autopsy to conceal its own malpractice that led to her husband's death. *Id.* at 536. Given those circumstances, the Court concluded "the claim is directly related to acts or treatments the [plaintiff] alleged were improperly performed or furnished, or that should have been performed or furnished, to [her husband] during his treatment and confinement," and determined the fraud claim was a health care liability claim under the TMLA. *Id.*

Providence contends that the "professional or administrative services" in this case are no less "directly related to health care" than those in *Carswell*, as Aiden's autopsy was "performed to confirm, rather than to conceal," the cause of his death, which occurred while he and his mother were receiving care at Providence. Providence notes that while the "record does not reflect the exact purpose(s)" of Aiden's autopsy, it could have occurred for an evaluation of the accuracy of his diagnosis, both for the family's benefit and for the benefit of the hospital and its current and future patients "to provide information about the perinatal treatment that could improve the well-being and lifespan of patients with trisomy 18." In sum, Providence urges that "[c]linical autopsies performed on patients who die while receiving health care at a hospital are inextricably related to that health care and to the health care of others." And here, because Aiden was a patient at the hospital before he died, Providence maintains that his autopsy is an extension of his health care.

We note that the *Carswell* court explicitly left open two key questions: whether an individual can be a patient after death, *see id.* at 535, and whether performing an autopsy or failing to obtain informed consent to perform an autopsy, without more, is health care under the TMLA, *see id.* at 536–37.

### (2) The Parents' arguments

The Parents argue that the "directly related to health care" element is not satisfied because Aiden's autopsy was unrelated to the health care provided to either Ashlee or Aiden in the hospital.

9

That is, they contend their claim is not a health care liability claim because the hospital's performance of Aiden's autopsy outside the boundaries of Ashlee's explicit consent does not depart from the standards of medical care or health care services.

And the Parents contend *Carswell* confirms that their claims are not health care liability claims under the TMLA, pointing to its passage stating:

> Even though the jury refused to find that [the hospital] negligently caused Jerry's death, it remains that the Carswells' post-mortem fraud claim was that the hospital's obtaining Linda's consent for the autopsy was based on and for the purpose of concealing the hospital's malpractice that caused Jerry's death. Given these circumstances, the claim was directly related to acts or treatments the Carswells alleged were improperly performed or furnished, or that should have been performed or furnished, to Jerry during his treatment and confinement. As such, the fraud claim was an HCLC.

505 S.W.3d at 536 (internal citations omitted). From this, they assert that there must be some allegation of improper conduct before the death for a post-mortem claim to be a health care liability claim under the TMLA. Here, because the allegations involve no underlying negligent acts while Aiden or Ashlee were Providence patients, the Parents maintain their claims are not health care liability claims.

Along with discussing *Carswell*, the Parents focus on two other cases that support their position: *Hare v. Graham*, No. 2-07-118-CV, 2007 WL 3037708 (Tex. App.—Fort Worth Oct. 18, 2007, pet. denied) (mem. op.) and *Salazar v. Dickey*, No. 04-08-00022-CV, 2010 WL 307852 (Tex. App.—San Antonio Jan. 27, 2010, pet. denied) (mem. op.).

In *Hare*, the plaintiff sued the pathologist who performed her husband's autopsy. 2007 WL 3037708, at *1. She alleged the hospital employees misled and intentionally deceived her about consent for the autopsy, and she sued the pathologist for intentional infliction of emotional distress, negligent mishandling of a corpse, and interference with the right of possession of a dead body. *Id.* In arguing that her claims were not health care liability claims subject to the TMLA, the plaintiff

10

contended that her case concerned "not whether the autopsy was performed according to acceptable standard, but that it was not authorized and was performed without proper consent." *Id.* at *2.

The Fort Worth Court of Appeals agreed, reasoning that the allegations did not raise a health care liability claim because the plaintiff's husband could not be a "patient" based on the Texas Health and Safety Code's definition of that term: "a person who is admitted to a hospital or residing in a nursing home." *Id.* at *3 (quoting Tex. Health & Safety Code Ann. § 13.002(8)). The court inferred that this definition "clearly implies that a person must be alive in order to be a 'patient,'" agreeing with a prior case that determined "a body was not a patient, nor was an autopsy a form of medical treatment." *Id.* (citing *Putthoff v. Ancrum*, 934 S.W.2d 164, 171 (Tex. App.— Fort Worth 1996, writ denied)). Thus, the court concluded "a dead body is not a patient" nor can a body "receive 'medical care, treatment, or confinement' after death," and determined the plaintiff's claims were not heath care liability claims. *Id.*

The San Antonio Court of Appeals in *Salazar* similarly adopts *Hare*'s reasoning. The plaintiff sued, among others, the physician who signed his father's death certificate, alleging that the doctor had a duty to, but did not, order an autopsy. 2010 WL 307852, at *1. The court relied on the definition of "patient" found in the Health and Safety Code and concluded that these allegations were not health care liability claims because the plaintiff's father was already dead when the doctor allegedly departed from acceptable standards and practices, such that his father could not be a patient or receive medical care, treatment, or confinement. *Id.* at *4.

The Parents contend that their suit is not predicated on allegations of medical malpractice regarding either Ashlee or Aiden's care but is instead narrowly focused on the specific terms of consent for Aiden's autopsy. They point to the *Carswell* court's discussion of *Hare* and *Salazar*,

11

in which it distinguished those two cases as turning on post-mortem actions that were not linked to pre-mortem healthcare. *Carswell*, 505 S.W.3d at 537. And they claim here that the autopsy "did not engage with the medical treatment" of Ashlee or Aiden, nor was it "intended to directly affect patient health outcomes." They continue that the autopsy was "not performed for the direct benefit of improving health care services for living patients" but was instead to confirm Aiden's diagnosis. Finally, the suit here seeks only mental anguish damages, which the Parents contend arise from Providence's "handling of their child's autopsy—a matter distinct from the health care services typically addressed in liability claims."

### (3) These allegations are health care liability claims

Prior cases are instructive, but not controlling for the issue before us. The Houston First's decision in *Ramos* is closely analogous as it dealt with the mishandling by a hospital of the remains of a dilation and curettage procedure performed at the hospital. *Ramos*, 388 S.W.3d at 743. Focusing on the alleged departure from accepted standards of care for "professional or administrative services directly related to health care", as are we, the Court found the alleged conduct directly related to health care. *Id.* at 746.

*Hare* and *Salazar* focus on the definition for "health care"—which incorporates the definition of "medical care"—which in turn uses the term "patient." Those courts reason that performing (or not performing) an autopsy could not be health care because a non-living person can no longer be a "patient." *Hare*, 2007 WL 3037708, at *3; *Salazar*, 2010 WL 307852, at *4. But neither case directly addresses the "professional or administrative services" portion of § 74.001(a)(13) and its nexus with health care. More particularly, *Hare* and *Salazar* do not address how "professional or administrative services" attendant to autopsies might directly relate to pre-morbid health care services.

12

The most helpful case here is *Carswell* and its articulation of the definition for "directly related to." As the *Carswell* court instructed, the phrase "directly related to" simply means "an uninterrupted, close relationship or link between the things being considered." *Id.* at 536. The allegation here fits that definition. It describes an infant delivered by caesarian section, accepted briefly as a patient, and who then expired all while in the hospital. Ashlee, while also a patient in the hospital, verbally communicated and documented in a written consent form her desire for only a limited autopsy to hospital personnel.[7] For reasons yet to be discovered, the hospital is alleged to have exceeded the scope of her consent through some conduct part and parcel of its professional and administrative services. The pleading before us describes a sufficient direct nexus between the provision of health care and the alleged improper autopsy. *See Carswell*, 505 S.W.3d at 537 (distinguishing *Hare* and *Salazar* where the claims are not "based entirely on postmortem actions of [the hospital] that were directed to a dead body" absent any link to pre-mortem health care).

We acknowledge that the Parents here do not complain about the health care Ashlee received as patient in her own right, or that Aiden received until his death. But we do not read *Carswell* (including its treatment of *Hare* and *Salazar*) to mean that for a post-mortem claim to be "directly related to health care," there *must* be allegations of deficient or improper health care before the patient's death. *See Carswell*, 505 S.W.3d at 535–36. The plain language of the TMLA does not support that interpretation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13). [8] Nor

---

[7] The petition alleges that Aiden was delivered at Providence on April 12, 2023. Ashlee was discharged from the hospital on April 14, 2023. On the 12th (while still a patient and as the parent of Aiden) she discussed with her OBGYN an autopsy and she "made it clear to . . . Providence nursing staff that she did not want an invasive autopsy[.]" The consent form was executed by Ashlee on April 14, the same day she was discharged.

[8] Were it otherwise, we would create the anomalous situation that the same improper professional or administrative service in one case would be a health care liability claim, while in another case not, based only on whether the claimants complain about the pre-mortem care. And if this were the rule, must the complaint of pre-mortem care be raised in a filed malpractice claim? Or would a verbal complaint to the hospital administration be enough? Would the complaint have to make a wrongful death allegation, or might it only relate to some other aspect of the premortem

does the TMLA support the Parents' position that a patient must be alive when the alleged negligent conduct occurs. Instead, the TMLA applies to professional or administrative services "when the claimed injury is directly related to health care of *some* patient." *Carswell*, 505 S.W.3d at 537 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10), (13)).

Because this appeal arises from the trial court's preliminary determination for the expert report requirement, we have a limited record consisting primarily of the pleadings. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.353. The Parents' Original Petition alleges that Providence "violated [its] duty" "to exercise the degree of care that a reasonably prudent medical provider would use to avoid harm to others" in the circumstances of Aiden's autopsy. The allegation describes a deviation from accepted standards of a health care practice: an autopsy performed in a hospital following the death of one of its patients. The TMLA uses "broad language" which "evidences legislative intent for the statute to have expansive application." *Loaisiga*, 379 S.W.3d at 256. Because the professional or administrative services underlying the Parents' complaint were directly related to health care Aiden and Ashlee received while they were Providence patients, the claims are health care liability claims under the TMLA. *See Carswell*, 505 S.W.3d at 537; *Ramos*, 388 S.W.3d at 746. The trial court erred in concluding otherwise. We sustain Providence's sole issue on appeal.

## CONCLUSION

For the above reasons, we conclude that the Parents' claims are health care liability claims under the TMLA for the purpose of deciding whether the Parents must file an expert report as

---

care? Nothing in the text of § 74.001(a)(13) answers those questions because nothing in the text establishes a "pre-mortem complaint" requirement as a component of a professional and administrative services based claim.

required by the TMLA; we reverse the trial court's order holding they are not. We remand the case to the trial court for further proceedings consistent with this opinion.[9]

JEFF ALLEY, Chief Justice

August 16, 2024

Before Alley, C.J., Palafox, and Soto, JJ.
Soto, J., dissenting

---

[9] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.353(e) ("If on interlocutory appeal and appellate court reverses a trial court's preliminary determination that a claim is not a health care liability claim, the claimant shall serve an expert report as required by Section 74.351 not late than 120 days after the date that the appellate court issues an opinion reversing the preliminary determination.").