Opinion issued March 23, 2023



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00182-CV

———————————

**MAURICE N. LEIBMAN, M.D., Appellant**

**V.**

**CLEVERATTA WALDROUP AND JAMES WALDROUP, INDIVIDUALLY, AND AS NEXT FRIENDS OF R.W., A MINOR, Appellees**

---

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-15669**

---

## MEMORANDUM OPINION

In this interlocutory appeal, appellant Maurice N. Leibman, M.D. challenges the trial court's order denying his motion to dismiss the claims brought against him by appellees Cleveratta Waldroup and James Waldroup, individually, and as next

friends of R.W., a minor. In his sole issue, Dr. Leibman contends that the trial court erred in denying his motion to dismiss because the Waldroups failed to file an expert report as required by the Texas Medical Liability Act (TMLA).[1] We affirm.

## Background

The Waldroups sued Dr. Leibman and several other defendants[2] after a dog bit their three-year old daughter, R.W., in the Loose Caboose restaurant in Spring, Texas, on January 9, 2021. The Waldroups alleged that, upon entering the restaurant, a pitbull dog named Kingston, belonging to Jennifer Romano and wearing a "service dog" vest, attacked R.W. without provocation, biting her cheek and severely injuring her. They further alleged that Romano and her friend, Perry Muras, who was also present at the restaurant and later told police that he had been previously attacked by Kingston, did not offer to help but instead fled the scene with Kingston.

In their original petition, the Waldroups asserted claims for negligence and aiding and abetting against Dr. Leibman. They alleged, in part, as follows:

> Dr. Leibman, [] Romano's gynecologist, provided a letter to her solely at her request for the purpose of avoiding eviction from her apartment, stating that she required her "service animals" on the basis of her "generalized anxiety disorder[.]" He took no steps to ascertain whether Kingston was actually a service animal, trained to assist her with a disability by performing specific works or tasks. He was indifferent to

---

[1] *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a).

[2] The other named defendants—Jennifer Romano, the dog's owner, Perry Muras, Romano's friend, and KP Mostyn Properties LLC, the premises owner—are not parties to this appeal.

the actual grave risk posed to the community by assisting Romano in her illegal and tortious conduct. As a result of his conduct, the Plaintiffs were injured.

The Waldroups sought damages under a bystander theory as well as recovery for medical expenses, pain and suffering, mental anguish, and disfigurement. Dr. Leibman answered asserting a general denial, among other defenses.

On October 18, 2021, Dr. Leibman moved to dismiss the Waldroups' claims against him under Chapter 74 of the Texas Civil Practice and Remedies Code. He argued that the Waldroups' claims against him "arise out of alleged health care provided by [him] to [] Romano" and therefore constitute a health care liability claim subject to Chapter 74's expert report requirement. Dr. Leibman argued that because the Waldroups failed to serve an expert report within 120 days of his filing an answer as required by Section 74.351(a), their claims against him should be dismissed.

The Waldroups responded that their claims against Dr. Leibman were not health care liability claims. They asserted that Romano had "used multiple letters procured from []Dr. Leibman to obtain fraudulent 'service animal' credentials for Kington." They argued that Dr. Leibman's "key misrepresentations were in relation to the qualifications of [] Romano's existing pet dogs as 'service animals[,]' an assessment [] which he was not qualified to make [] and did not directly relate to health care provided to [] Romano. Dr. Leibman aided and abetted and conspired with Romano to misrepresent Kingston as a 'service animal[,] which Kingston was

3

not." The Waldroups asserted that they did not "take issue with Dr. Leibman's diagnosis that [] Romano suffered from an anxiety disorder, nor even his professional opinion that a 'service animal' could assist [] Romano with her daily activities and be part of a treatment program for her anxiety." Instead, the Waldroups claimed that "Dr. Leibman had no basis and no qualifications to justify his opinions that Romano's animals were 'service animals' and specifically that Kingston, the animal that attacked and seriously injured [R.W.], was a service animal, while also offering his unqualified and non-medical opinion regarding Kingston's behaviors." The Waldroups further argued that Dr. Leibman waived his right to seek dismissal under Section 74.351 by participating in discovery and failing to seek dismissal earlier during litigation. The Waldroups attached to their response a copy of a letter from Dr. Leibman dated July 15, 2019, addressed "to whom it may concern," stating "Jennifer has General Anxiety Disorder and having her service animals helps her with this disorder. Jennifer is currently taking medication for the disorder as well." The Waldroups also attached a Case Supplemental Report from the Harris County Sheriff's Office [HCSO] dated February 1, 2021, identifying three additional letters obtained from Dr. Leibman's office:

> A letter dated 5/9/17 from Doctor Leibman states Jennifer has a depression/anxiety disorder that requires she have her four service animals which are all certified to be with her to help with the disorder.

4

A letter dated 8/3/17 states Jennifer has General Anxiety Disorder and having her service animals helps her with this disorder. It further says Jennifer is taking medication for the disorder.

A letter dated 12/17/19 advises, "Due to Jennifer Romano['s] anxiety disorder she needs all her service animals. Kingston walks into every entrance before her, everywhere we go. Daisy licks her entire face, Molly brings her toys and sits in her lap, Maddie sits on her chest, Milly puts her paw on her face and Major si[ts] at her side and Lulu sits at her head. It appears as she needs these service animals to control her anxiety and perform her daily duties."

Dr. Leibman supplemented his motion to dismiss and attached several exhibits, including a HCSO Case Supplemental Report dated January 11, 2021 and his sworn affidavit.

Dr. Leibman replied to the Waldroups' response stating, in part:

Whether it is within the standard of care or negligent for a gynecologist to diagnose and treat generalized anxiety in a patient or to determine that a patient having her service animals helps with this disorder is a question that would require expert physician testimony. Similarly, whether it is within the standard of care or negligent for a physician (gynecologist or other specialty) to provide a patient with "general anxiety disorder" whose "service animals help[] with this disorder" with a letter to assist with avoiding eviction is a question that calls for physician expert testimony.

Dr. Leibman argued that "[t]he need for expert testimony from a physician as to the conduct of [] Dr. Leibman supports that the claims against [] Dr. Leibman are health care liability claims that fall under Chapter 74." Dr. Leibman further argued that he had not waived his right to seek dismissal of the Waldroups' claims under Section 74.351.

5

The Waldroups filed a sur-reply to the motion to dismiss. They argued that their claims were not health care liability claims because "Dr. Leibman's assessment and representation of Kingston as a 'service animal' is not 'directly related to health care.' The issue here is Dr. Leibman's unqualified, non-medical opinion, offered in writing to any potential recipient, about the training, behavior and legal status of Romano's dog." They re-urged their argument that Dr. Leibman had waived his right to seek dismissal of their claims based on his failure "at any time since being served, specifically in his answer or initial disclosures, to identify [their claims] as [] 'health care liability claim[s]' under Chapter 74."

In his reply to the Waldroups' sur-reply, Dr. Leibman argued that, contrary to the Waldroups' assertion, a defendant's right to obtain dismissal under Section 74.351 is not an affirmative defense that required him to file an affirmative defense pleading.

The trial court held a hearing on the motion to dismiss on November 29, 2021. The parties subsequently filed post-hearing supplemental briefing. The trial court denied Dr. Leibman's motion by written order on March 4, 2022. This interlocutory appeal followed.

**Discussion**

On appeal, Dr. Leibman challenges the trial court's order denying his motion to dismiss. He contends that the Waldroups' claims are health care liability claims

6

under Chapter 74, and the trial court erred in denying his motion to dismiss because the Waldroups failed to serve an expert report as required by Section 74.351. The Waldroups respond that they did not file an expert report because their claims against Dr. Leibman are not health care liability claims. Instead, they argue, their claims are based on Dr. Leibman's representations regarding the qualifications, training, and behavior of Kingston and are therefore not "directly related to health care."

**A.    Standard of Review**

Whether a pleading asserts a health care liability claim presents a question of law that courts review de novo. *Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019). To answer that question, we focus on the claim's "underlying nature . . . rather than its label." *Id.* To determine the claim's underlying nature, we must consider the "entire court record, including the pleadings, motions and responses, and relevant evidence properly admitted." *Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012). We focus on the essence of the claim and consider the alleged wrongful conduct and the duties allegedly breached. *See Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 851 (Tex. 2005). When the essence of the suit is a health care liability claim, a party cannot avoid the requirements of the statute through artful pleading. *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 543 (Tex. 2004); *see Yamada v. Friend*, 335 S.W.3d 192, 194–95 (Tex. 2010).

## B.    Applicable Law

Under the TMLA, a health care liability claim is "a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13). "Health care" is "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 74.001(a)(10). A health care liability claim includes three basic elements: (1) the defendant must be a physician or health care provider; (2) the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's conduct must proximately cause the claimant's injury. *Tex. West Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 179–80 (Tex. 2012) (concluding employee's claims against employer, both of whom were health care providers, alleging injuries arising out of inadequate training, supervision, risk mitigation, and safety in mental health facility, constituted health care liability claims). The party moving for dismissal bears the burden of

8

proving that the cause of action is a health care liability claim. *Belmont Vill. Hunters Creek TRS, LLC v. Marshall*, 634 S.W.3d 115, 121 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). If expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim. *Tex. West Oaks Hosp.*, 371 S.W.3d at 182.

A health care liability claimant must, within 120 days after a defendant's original answer is filed, serve the defendant health care provider with an expert report. TEX. CIV. PRAC. & REM. CODE § 74.351(a). A health care provider may object and move to dismiss the lawsuit on the grounds that it was not served with a timely report. *See id.* § 74.351(b). If the trial court denies the motion to dismiss, the health care provider may file an interlocutory appeal. *Id.* § 51.014(a)(9).

## C. Analysis

The first and third elements of a health care liability claim are not at issue here—that is, the Waldroups do not dispute that Dr. Leibman is a physician and that his conduct proximately caused the complained-of injuries. Rather, as in most disputes over whether a claim constitutes a health care liability claim, the issue involves the second element—whether the Waldroups' claims concern "treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly

9

related to health care." *Lake Jackson Medical Spa, Ltd. v. Gaytan*, 640 S.W.3d 830, 840–41 (Tex. 2022) (citing TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13)).

### 1. Claimed Departure from Accepted Standards of Health Care

Dr. Leibman contends that the Waldroups' claims are health care liability claims because they allege that Dr. Leibman's conduct departed from "accepted standards of . . . health care." He argues that their claims "rest squarely on the provision of [Dr. Leibman's] letters," and the opinions and basis for those opinions, "all of which exist solely in the context of a physician-patient relationship relating to the patient's disorder in furtherance of her health, well-being and safety."

The Waldroups respond that Dr. Leibman mischaracterizes their claims. They argue that their claims do not relate to Dr. Leibman's diagnosis of Romano with generalized anxiety disorder or to his medical judgment that she may benefit from a service animal to help with her disorder. Rather, they assert, their claims are based on Dr. Leibman's statements in his letters about Kingston—specifically, his statements that the dog was a "service animal" and was "certified," and his description of Kingston's behavior. They argue that Dr. Leibman's letters assisted Romano in obtaining a service vest for Kingston and aided and abetted Romano in deceiving the public that Kingston was a service dog when, in fact, he was not.

In support of his contention that the Waldroups' claims are health care liability claims, Dr. Leibman cites *Buchanan v. O'Donnell*, 340 S.W.3d 805 (Tex. App.—

San Antonio 2011, no pet.) and *Monson v. Allen Family First Clinic, P.A.*, 390 S.W.3d 598 (Tex. App.—Dallas 2012, no pet.). In *Buchanan*, the plaintiff and her husband were delivering newspapers when Kristy Dawn Anders rear-ended them, seriously injuring the plaintiff and killing her husband. *See Buchanan*, 340 S.W.3d at 809. After learning through discovery that Anders may have been under the influence of negligently or illegally prescribed medications at the time of the collision which may have contributed to the accident, the plaintiff sued Anders' primary care physician and two physician's group associates, asserting claims for negligence, negligence per se, and participatory liability. *See id.* Arguing that the claims against them were health care liability claims, the defendant doctors moved for dismissal based on the plaintiff's failure to timely serve expert reports. *See id*. The trial court granted the motions and the plaintiff appealed. *See id.*

The court of appeals noted that the crux of the plaintiff's claim was that the doctors were negligent in their treatment of Anders by improperly or unnecessarily prescribing her medications, as well as in their failure to treat Anders by failing to supervise her use of those medications and by failing to warn her of the dangers of overuse. *See id*. at 811. The court concluded that expert testimony would be required to establish (1) the proper standard of care for prescribing medications, as well as to determine whether the doctors unnecessarily prescribed or over-prescribed medications to Anders, and (2) the proper standard of care for supervising patients'

use of prescribed medications, as well as to determine whether appellees were negligent in their supervision of or failure to supervise Anders' use of the medications. *See id.* Finding that the facts alleged in the plaintiff's petition were inseparable from the defendants' rendering of (or failure to render) medical care, the court concluded that the plaintiff's negligence claim was a health care liability claim. *See id.*

The facts in *Buchanan* are distinguishable from the facts in this case in a key respect. In *Buchanan*, the plaintiff alleged that the defendants were negligent in their *treatment* of her by improperly or unnecessarily prescribing her medication and by their failure to supervise her use of those medications and to warn her of the dangers of overuse. These allegations relate directly to the provision of health care and concern the applicable standards of care for prescribing medication and supervising a patient's use of the medication and, therefore, require expert testimony. Here, the Waldroups do not take issue with Dr. Leibman's diagnosis of Romano with generalized anxiety disorder or with his medical judgment that she may benefit from a service animal to help with her disorder. Rather, their claims are based on Dr. Leibman's statements in his letters that Kingston was a "service animal" and was "certified," which they allege assisted Romano in obtaining a service vest for Kingston and aided and abetted Romano in deceiving the public that Kingston was a service dog when, in fact, he was not.

In *Monson*, the plaintiff saw the defendant physician for evaluation and treatment. *See Monson*, 390 S.W.3d at 599. When she left the clinic, the plaintiff received a note regarding her ability to return to work. *See id.* The note stated that the plaintiff felt she could return to work after five days, would then be limited to part-time work for one to two weeks, and "then if tolerated full-time." *Id.* The physician's office manager later sent a letter to the plaintiff's employer stating that the plaintiff left the clinic with no work limitation but that she asked for the specific return date with the noted limitations. *See id.* at 600. After the plaintiff was terminated by her employer, she asserted a negligence claim against the physician, the office manager, and the clinic for failing to (1) properly supervise and train her office manager and (2) take proper steps to avoid the disclosure of the plaintiff's confidential information. *See id.* The defendants filed a motion to dismiss the plaintiff's claims because plaintiff had failed to serve them with an expert report as required by section 74.351. *See id.* The trial court granted the motion and dismissed the case. *See id.*

On appeal, the plaintiff argued that her negligence claim did not relate to health care because it alleged that the physician and the clinic were negligent in "[w]riting such a letter," and that their conduct in sending the letter to her employer was outside the definition of health care because "the conduct at issue has nothing

to do with medical care, treatment, or the release of confidential medical information." *Id.* at 602. The court disagreed, stating:

> A physician or health care provider's note recommending that a patient have time off from work or modified working conditions is "health care" when the time off or modified working conditions are part of the patient's medical care or treatment. The note [the plaintiff] received from the clinic was "health care" because the absence from work was based on [the plaintiff's] treatment by Dr. Reddy. [The office manager's] letter correcting Dr. Reddy's unsigned note concerning the plaintiff's ability to return to work as a result of the medical care she received at the clinic was part of the health care provided [the plaintiff] because it was "an act performed . . . by [a] health care provider . . . on behalf of a patient during the patient's medical care." The fact that the letter may have contained false information or impugned [the plaintiff's] character does not take the letter out of the definition of "health care."

*Id.* at 602–03.

Although similar in some respects, *Monson* is also distinguishable from the case before us. In *Monson*, the claim was brought by the patient against her physician and related to the doctor's statements about the *patient* to a third party. As the court noted, the physician's note recommending that the plaintiff have time off from work or a modified work schedule was health care because the time off or modified schedule was part of the patient's medical care or treatment. Here, however, the statements about which the Waldroups complain do not concern Romano, Dr. Leibman's diagnosis of her with generalized anxiety disorder, or his judgment that she may benefit from her service animals. Rather, their claims are based on Dr. Leibman's statements that Kingston was a service animal who was certified and

14

about the dog's behavior and were therefore not "an inseparable or integral part of the rendition of health care" to Romano. *See Tex. West Oaks Hosp.*, 371 S.W.3d at 180 (citing *Diversicare*, 185 S.W.3d at 848, 850).

Dr. Leibman also argues that "whether it is within the standard of care for a physician (gynecology or other specialty) to provide a patient with 'general anxiety disorder' whose 'service animals help with this disorder' a letter to assist with avoiding eviction is a question that calls for physician expert testimony." He argues that expert testimony is needed to explain what steps, if any, a physician using ordinary care would take in the provision of these types of letters. Thus, he reasons, the Waldroups' claims are health care liability claims. *See id.* at 182 ("We now hold that if expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim."). This argument is unavailing. The Waldroups' claims do not allege a departure from the standard of care applicable to a health care provider. Rather, they argue that expert testimony is not required because there is no accepted standard related to when a medical doctor for humans can offer his opinion about the qualifications and behaviors of animals. *See Vill. Green Alzheimer's Care Home, LLC v. Graves*, 650 S.W.3d 608, 627 (Tex. App.—Houston [1st Dist.] 2021, pet. denied) (concluding no expert report was necessary to establish standard of care for housing stray dogs in common areas of building accessible to public, even if medical

15

care occurs in and around area; relevant standards come from tort law developed through common law to address dangers on premises and have no dependence on or connection to medical care or medical judgment).

Separate and apart from Dr. Leibman's diagnosis of Romano and his opinion that she may benefit from her service animals are his statements that Kingston was a service animal, was certified, and behaved in a particular way. We conclude that the gravamen of the Waldroups' negligence and aiding and abetting claims against Dr. Leibman is that he had no basis or qualifications to make the statements about Kingston for the purpose of helping Romano avoid eviction and which assisted her in obtaining a service vest for the dog and deceiving the public that Kingston was a service dog. These allegations do not give rise to a cause of action "for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care[.]" TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13). Stated differently, the acts giving rise to the Waldroups' claims against Dr. Leibman are not "inseparable" from the rendition of health care and are not based on a breach of a standard of care applicable to Dr. Leibman. *See Vill. Green*, 650 S.W.3d at 627 (concluding plaintiff's premises liability and gross negligence claims brought against assisted living facility on behalf of mother mauled by dog in facility's lobby were separate from health care services because dog attack had no connection to

16

residential services to which patient had consented and was only connected to health care because of fortuity of location: "[T]he alleged negligence can be so far removed from the provision of health care that it is analytically separate from it."); *Belmont Vill. Hunters Creek*, 634 S.W.3d at 124–25 (concluding plaintiff's claim against assisted living facility arising from sexual assault in residential unit after facility prohibited residents from adding locks to doors of private quarters where no health care-related reason existed for doing so, was separable from the rendition of medical services and thus was not health-care-standards health care liability claim); *Thilo Burzlaff, M.D., P.A. v. Weber*, 582 S.W.3d 314, 323 (Tex. App.—San Antonio 2018, no pet.) (concluding that gravamen of former patient's claims of defamation, Deceptive Trade Practices Act violations, negligence per se, and intentional infliction of emotional distress against medical practice administrator was that administrator called police and told them that patient had mental issues for purpose of removing patient from practice's premises; allegations were not inseparable from rendition of medical services and not based on breach of standard of care applicable to administrator); *see also Iasis Healthcare Corp. v. Pean*, No. 01-17-00638-CV, 2018 WL 3059789, at \*5 (Tex. App.—Houston [1st Dist.] June 21, 2018, pet. denied) (mem. op.) ("At their core, these claims do not allege that Iasis provided health or medical care, safety, or professional or administrative services directly related to health care that fell below the standard of care. Instead, these are claims

brought by Pean (a former patient) against Iasis premised on the act of filing criminal charges. Medical expert testimony would not be required to establish whether or not Iasis was a willing participant[] in a conspiracy to maliciously prosecute Pean."); *Alsup v. Hickory Trail Hosp.*, No. 05-16-00527-CV, 2017 WL 1046769, at *13 (Tex. App.—Dallas Mar. 20, 2017, no pet.) (mem. op.) (concluding plaintiff's invasion of privacy claim based on defendant hospital and counselor's attorneys' e-filing of documents during litigation that included sensitive information was not directly related to defendants' provision of health care services and was therefore not health care liability claim).

## 2. Claimed Departure from Accepted Standards of Safety

Dr. Leibman next contends that the Waldroups' claims are health care liability claims because they implicate an alleged "departure from accepted safety standards." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13)).[3] In support of his assertion, Leibman directs us to the Americans with Disabilities Act (ADA)[4] and the

---

[3] The Supreme Court has construed "safety" according to its common meaning as "the condition of being untouched by danger; not exposed to danger; secure from danger, harm or loss." *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 501 (Tex. 2015) (quoting *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 855 (Tex. 2005)).

[4] The American with Disabilities Act of 1990 (ADA) prohibits employment discrimination against qualified individuals with a disability because of their disability. *See* 42 U.S.C. §§ 12101–12213 (2009).

United States and Texas Fair Housing Acts (FHA).[5] Noting that these laws relate to safety and health care and protect individuals with a physical or mental disorder which affects their daily activities, Dr. Leibman contends that the Waldroups' claims that he did not take steps to determine that Romano's service animals were fit for her disability are predicated on ADA and FHA standards. Therefore, he reasons, the Waldroups' claims relate not only to his health care of Romano but also to alleged departures from safety standards directly concerning health care pursuant to the ADA and FHA.

A review of the record shows that Dr. Leibman did not present this argument to the trial court in any of his pleadings or at the hearing on his motion to dismiss. In his motion, supplement to his motion, and reply to the Waldroups' response to his motion, Dr. Leibman argued only that the conduct on which the Waldroups' claims were based arose out of his medical care and treatment of Romano and thus their claims were health care liability claims. In his post-hearing reply in support of his motion, Dr. Leibman cited *Texas West Oaks Hospital, L.P. v. Williams* for the

[5]  The federal Fair Housing Act (FHA) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of . . . [that person]." 42 U.S.C. § 3604(f)(2)(A). Prohibited discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" *Id.* § 3604(f)(3)(B). The Texas Fair Housing Act (TFHA) provides rights and remedies substantially equivalent to those granted under the FHA. *See* TEX. PROP. CODE § 301.001–.170.

19

general proposition that a claim against a health care provider is a health care liability claim if it implicates a health care-related safety standard even if the standard is not directly related to the provision of health care. *See* 371 S.W.3d at 186. He did not argue that the Waldroups' claims against him alleged departures from safety standards pursuant to the ADA and FHA. Having failed to do so, Dr. Leibman waived this argument for our review. *See Greenville v. Bills*, No. 01-19-00264-CV, 2020 WL 1942457, at \*8 (Tex. App.—Houston [1st Dist.] Apr. 23, 2020, no pet.) (mem. op.) (noting that to preserve error for appellate review party's argument on appeal must comport with its argument in trial court); *Pajooh v. Miller*, No. 01-16-00927-CV, 2018 WL 3233466, at \*5 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.) (same).

Dr. Leibman also argues that application of the non-exhaustive list of considerations set forth in *Ross v. St. Luke's Episcopal Hospital*, 462 S.W.3d 496 (Tex. 2015) demonstrates that the Waldroups' claims are safety standards-based claims that are health care liability claims. In *Ross*, the Texas Supreme Court concluded that "for a safety standards-based claim to be a [health care liability claim] there must be a substantive nexus between the safety standards allegedly violated and the provision of health care. . . . The pivotal issue in a safety standards-based claim is whether the standards on which the claim is based implicate the defendant's duties as a health care provider, including its duties to provide for patient safety."

*Id.* at 504–05. The Court enumerated the following considerations in analyzing whether a claim is substantively related to the defendant's provision of medical or health care and is therefore a health care liability claim:

1. Did the alleged negligence of the defendant occur in the course of the defendant's performing tasks with the purpose of protecting patients from harm;

2. Did the injuries occur in a place where patients might be during the time they were receiving care, so that the obligation of the provider to protect persons who require special medical care was implicated;

3. At the time of the injury was the claimant in the process of seeking or receiving health care;

4. At the time of the injury was the claimant providing or assisting in providing health care;

5. Is the alleged negligence based on safety standards arising from professional duties owed by the health care provider;

6. If an instrumentality was involved in the defendant's alleged negligence, was it a type used in providing health care; or

7. Did the alleged negligence occur in the course of the defendant's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies?

*Id.* at 505. Dr. Leibman asserts that factors 1, 5, 6, and 7 are present.

As to the first factor, Dr. Leibman contends that his letters were for the purpose of protecting Romano from the harm of increased anxiety that she would suffer if she was evicted or if she was unable to keep her animals for service and support. Dr. Leibman's supplement to his motion to dismiss includes as an exhibit a

21

HCSO Case Supplemental Report. The report states that an officer contacted Dr. Leibman's office to verify that the December 17, 2019 letter on Dr. Leibman's letterhead was in fact issued from their office. The report states that a member from Dr. Leibman's staff confirmed that the letter was issued from their office and advised the officer that "the primary reason of the letter was [t]heir client[] needed it for her apartment complex. The client was possibly getting evicted and requested the letter." The evidence shows that the primary purpose of the letter was to help Romano avoid eviction.

With regard to the fifth factor, Dr. Leibman asserts that the letters he provided were made in connection with federal standards promoting health and safety by enabling Romano to keep her animals that provided services promoting her emotional health. As discussed above, Dr. Leibman did not argue in the trial court that the Waldroups' claims against him alleged departures from safety standards pursuant to the ADA and FHA. Further, he does not articulate what safety standards, if any, arising from his professional duties as a health care provider apply to the statements in his letters that Kingston was certified as a service animal.

As to the sixth factor, Dr. Leibman asserts that the letters he provided were "physician letters of a type that physicians issue on behalf of their patients," and therefore "the professional opinion letter[] relates to the provision of health care services." This argument is conclusory and unsupported by evidence in the record.

22

As to the seventh factor, Dr. Leibman's assertion that he provided the letters to comply with federal safety-related requirements is not supported by the record and was not presented to the trial court.

As Dr. Leibman correctly notes, the safety component of a health care liability claim need not be directly related to the provision of heath care so long as the acts or treatment at issue are integral to a patient's medical care or treatment. *See Tex. West Oaks Hosp.*, 371 S.W.3d at 182 (concluding provision of emergency notification devices, warning of dangers associated with psychiatric patients, providing safe workplace, and properly training caregiver at psychiatric facility were integral to patient's care and confinement). Because there is no evidence of an applicable safety-related standard, we cannot conclude that Dr. Leibman's provision of letters opining on the qualifications of Romano's dog as a service animal was integral to his treatment of her. *See id*; *Omaha Healthcare Ctr., LLC v. Johnson*, 344 S.W.3d 392, 395 (Tex. 2011) (concluding that negligence claim brought by estate of nursing home resident who died following spider bite was health care liability claim because underlying nature of claim was that nursing home should have but failed to exercise care required of ordinarily prudent nursing home to protect and care for resident during her confinement).

We conclude that the Waldroups' claims against Dr. Leibman are not health care liability claims that required them to serve an expert report pursuant to Section

23

74.351(a) of the TMLA. The trial court did not abuse its discretion when it denied Dr. Leibman's motion to dismiss the Waldroups' claims against him. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(b). We overrule his issue.[6]

## Conclusion

We affirm the trial court's March 4, 2022 order denying Dr. Leibman's motion to dismiss the Waldroups' claims against him.

Amparo Guerra
Justice

Panel consists of Justices Landau, Countiss, and Guerra.

---

[6] In light of our holding that the Waldroups' claims are not health care liability claims and therefore no expert report was required, we need not address Dr. Leibman's additional argument that he did not waive his right to seek dismissal under Section 74.351 of the TMLA.